1 | Craig R. Brittain

2 | 8625 E. Sharon Dr.

3 | Scottsdale, AZ, 85260

4 | (602) 502-5612

5 | craig@brittainforsenate.com

6 | craigrbrittain@gmail.com

7

8 | # IN UNITED STATES DISTRICT COURT

9 | # FOR THE DISTRICT OF ARIZONA

10

11 | CRAIG R. BRITTAIN, an individual and US Senate candidate in Arizona in the 2018 Federal Elections;

No. CV-18-01714-PHX-BSB _____

12

13 | BRITTAIN FOR US SENATE, a Principal Campaign Committee, (And on behalf of all similarly affected users of Twitter).

**COMPLAINT**

(1) Violation of the First Amendment of the US Constitution
(2) Violation of Federal Election rules (47 U.S. Code § 315)
(3) Breach of Contract
(4) Conversion
(5) Violation of Antitrust Laws
(6) Violation of the Telecommunications Act of 1996 (47 U.S. Code § 230)
(7) Negligent Infliction of Emotional Injury/Distress
(8) Tortious Interference
(9) Promissory Estoppel

14

15

16 | Plaintiff(s),

17

18 | VS.

19

20

21 | TWITTER, INC., a California

22 | corporation.

23

24 | Defendant.

25 | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

26

27

28

1   Plaintiffs, Craig R. Brittain ("Brittain") and Brittain for US Senate

2   (collectively "Plaintiffs"), hereby file this Complaint for Violation of the First

3   Amendment of US Constitution, Violation of Federal Election rules, Breach of

4   Contract, Conversion, Violation of Antitrust Laws, Violation of the

5   Telecommunications Act of 1996, Negligent Infliction of Emotional

6   Injury/Distress, Tortious Interference, and Promissory Estoppel against

7   Defendant, Twitter, Inc. ("Twitter"), And would show as follows:

8

9                               INTRODUCTION

10          1. The First Amendment of the United States Constitution protects the

11   right to freedom of religion and freedom of expression from government

12   interference. It prohibits any laws that establish a national religion, impede the

13   free exercise of religion, abridge the freedom of speech, infringe upon the

14   freedom of the press, interfere with the right to peaceably assemble, or prohibit

15   citizens from petitioning for a governmental redress of grievances.

16          2. It was adopted into the Bill of Rights in 1791. The Supreme Court

17   interprets the extent of the protection afforded to these rights. The First

18   Amendment has been interpreted by the Court as applying to the entire federal

19   government even though it is only expressly applicable to Congress.

20   Furthermore, the Court has interpreted the Due Process Clause of the

21   Fourteenth Amendment as protecting the rights in the First Amendment from

22   interference by state governments.

23          3. President Trump's Twitter account (@realDonaldTrump) is an

24   important source of news and information about the government, and an

25   important public forum for speech by, to, and about the President. Likewise,

26   the accounts of all elected officials and candidates are equal to that of of the

27   President – they are important public forums and sources of information. In an

28   effort to suppress dissent in this forum, Twitter has excluded—"suspended"—

1   Twitter users who have criticized, supported, or otherwise commented on the

2   President or his policies, or criticized, supported or commented on other public

3   officials or candidates. This practice is unconstitutional, and this suit seeks to

4   end it.

5       4. As the Supreme Court recognized in 2017, and as Knight First

6   Amendment Center v. Trump recognized just a few weeks ago, social media

7   platforms like Facebook and Twitter provide "perhaps the most powerful

8   mechanisms available to a private citizen to make his or her voice heard."

9   Packingham v. North Carolina, 582 U.S. (2017). These platforms have been

10  "revolution[ary]," not least because they have transformed civic engagement

11  by allowing elected officials to communicate instantaneously and directly with

12  their constituents. "Governors in all 50 States and almost every Member of

13  Congress have set up [Twitter] accounts for this purpose", allowing citizens to

14  "petition their elected representatives and otherwise engage with them in a

15  direct manner." Twitter enables ordinary citizens to speak directly to public

16  officials and to listen to and debate others about public issues, in much the

17  same way they could if they were gathered on a sidewalk or in a public park,

18  or at a city council meeting or town hall.

19      5. Because of the way the President and his aides use the

20  @realDonaldTrump Twitter account, the account is a public forum under the

21  First Amendment. Likewise, the accounts of all other politicians and

22  candidates are equally public forums. Defendants have made the Twitter

23  platform accessible to all, allowing users to directly engage the President's 52

24  million followers. The President's tweets routinely generate tens of thousands

25  of comments in the vibrant discussion forums associated with each of the

26  President's tweets. Further, Twitter has promoted the President's account as a

27  key channel for official communication. Politicians/candidates use their

28  accounts to make formal announcements, defend their official actions, report

1    on meetings with foreign leaders, and promote their positions on health care,

2    immigration, foreign affairs, and other matters. Tweets from

3    @realDonaldTrump and other politicians and candidates are "official

4    statements," and they have been treated as such by fellow politicians, world

5    leaders, the National Archive and Records Administration, and Federal Courts.

6       6. Plaintiff Craig R. Brittain represents individuals from across the

7    country who are part of the Brittain for US Senate team, as well as users

8    named and not named in the suit who have been suspended from the Twitter

9    platform, and the ability to access the @realDonaldTrump account as well as

10   the accounts of thousands of US politicians and candidates because of opinions

11   they expressed in public forums. Because of their

12   criticism/support/commentary of the President/other politicians/candidates,

13   Plaintiffs have been prevented or impeded from viewing tweets, from replying

14   to tweets, from viewing discussions associated with the tweets, and from

15   participating in those discussions. Defendants' actions violate the First

16   Amendment rights of the Plaintiffs, and other users that follow politicians and

17   candidates, who are now also deprived of their right to read the speech of the

18   dissenters who have been suspended/shadowbanned/limited.

19       7. Plaintiffs respectfully ask that the Court declare that viewpoint-based

20   exclusion from Twitter's public forums violates the First Amendment, and

21   order the Defendants to restore their access.

22       8. On its "Values" page, Twitter states: "We believe in free expression

23   and believe every voice has the power to impact the world."

24       9. However, in defiance of United States law, as well as its own

25   founding principles and terms of service, Twitter has decided that it will not

26   allow Brittain and/or the staff of his principal campaign committee, Brittain

27   for US Senate, to respectfully share their views and campaign on its open

28   public  platform, nor allow Plaintiffs to extend the public forum to their

1    constituents in the same manner done by President Donald J. Trump

2    (@realDonaldTrump) and countless other public candidates and elected

3    officials.

4        10. Brittain's Twitter account (@CraigRBrittain) and the account of his

5    independent media examination/journalism outlet (@AuditTheMedia) were

6    permanently suspended on February 1 and February 2, 2017. The account of

7    his principal campaign committee (@SenatorBrittain) was suspended on

8    March 30, 2018. A second wave of suspensions against fans/supporters and

9    members of his staff (@Brittain4Senate, @AngMartinelli, and many others)

10   was conducted on May 23, 2018. These combined interests will henceforth be

11   known as "the Accounts" for purposes of the complaint.

12       11. Twitter has not banned the Accounts because Plaintiffs have engaged

13   in disrespectful, harassing or abusive behavior. On the contrary, during their

14   over five years on the platform, Plaintiffs have treated other users with the

15   utmost respect and courtesy (in spite of their receipt of well-documented and

16   widespread abuse from many users who have not been suspended or even

17   cautioned by the Defendant).

18       12. Plaintiffs used the Accounts to caution against the use of Twitter to

19   harass/threaten other users, at one point detailing over 300 threats made by

20   users towards President of the United States Donald J. Trump on Twitter in the

21   hashtag #ProtectTrump.

22       13. Brittain's primary account (@CraigRBrittain) was suspended after

23   almost a thousand people retweeted a post asking @jack (Twitter CEO Jack

24   Dorsey) to unsuspend numerous popular celebrities who had received

25   unjustified suspensions stemming from their use of the public forum.

26       14. The account of his campaign committee, @SenatorBrittain (Craig R.

27   Brittain for US Senate), was suspended after over 2,000 people retweeted a

28   post asking for his campaign committee to be verified by Twitter.

15. This lawsuit implicates Twitter's responsibility as a public forum as recently ruled in Knight First Amendment Institute v. Trump et. al. (1:17-cv-05205), where the honorable Naomi Reice Buchwald, Judge for the Southern District of New York, ruled that President Donald J. Trump must unblock all Twitter users, regardless of the content of their messaging, and also ruled that President Trump's Twitter space is an interactive public forum. The ruling also implicates that Twitter itself is a public forum space under the US Constitution, and thus all First Amendment Protections (must) apply to its use.

16. In regards to Knight First Amendment Center v. Trump, Defendant must reasonably provide access to that public forum space by unsuspending all users who are followers of President Donald J. Trump or any other public official or candidate, as well as any/all public candidates and officials, whether they are supporters, critics, or neutral to the points of view of the President of the United States or any other candidate or elected official.

17. Likewise, being as President Donald J. Trump is one of many politicians whose tweets create such a public space, Twitter must extend that same public forum to followers and critics of all US politicians and subsequently all journalistic outlets, in order to protect two-way freedom of speech established by the First Amendment.

18. By Plaintiffs' estimate, over 5 million users with over 15 million human accounts  have been unreasonably permanently suspended, and evidence, including testimony from many notable users, indicates over 50 million users and over 150 million accounts have been temporarily suspended and/or 'Shadowbanned' where Shadowbanned shall be defined as the process where Tweets by users, especially public officials and world leaders to include President Trump, as well as push notifications and other means of conducting public discourse, have been hidden/obscured from their viewing in such a way that does not constitute acceptable formatting/filtering, but rather

but rather censorship of public speech. Other variations of the term shall include the action verb ("shadowbanning") and noun ("shadowban"). 19. The combined set of users banned/shadowbanned/otherwise silenced by Twitter will henceforth be referred to as "Plaintiffs and Others" to indicate public interest. Alternatively, "Plaintiffs and Others" can be read as "any/all users who are subject to suspension/shadowban/limit/downrank/unverifying" by Twitter.

20. Defendant has also created an unlevel playing field for speech by promoting ideas which it agrees with on its @Policy account, by engaging in retweeting and promoting views which the Defendant agrees with from corporate accounts which should be neutral moderators and conducting news media interviews in which they declare political views while hiding and even censoring the accounts of those they disagree with – if the space is to be upheld as a public forum, this is a clear violation as rather than a public forum, Defendant has held itself selectively to be representing and championing the opinions of private citizens over the interest of public discourse, and cannot be considered a 'good actor' by a reasonable standard, where a 'good actor' is a neutral platform moderator whose only interest is civil discourse. The promotion of set beliefs runs counter to the pledge of free speech presented by Twitter, as the company itself is now openly taking political/social stances rather than presenting private views as unaffiliated with the company.

21. Examples of Tweets from @Policy (which are the official views of Defendant as a company) include: "Twitter stands for strong #NetNeutrality rules because they're essential for innovation❗, free speech ●and public safety⊖. If you agree, make your voice heard today◀»." (Tweeted on May 15, 2018), "Twitter is moving forward on our commitment to providing transparency for online ads. We believe the Honest Ads Act provides an appropriate framework for such ads and look forward to working with bill

sponsors and others to continue to refine and advance this important proposal."
(Tweeted on April 10, 2018), "Twitter stands with Dreamers. Before the year
runs out, there is still a chance for bipartisan agreement in Congress. Please
consider reaching out to your members of Congress and urge them to act.
#DreamActNow" (Tweeted on December 13, 2017), and "Blocking a world
leader from Twitter or removing their controversial Tweets would hide
important information people should be able to see and debate. It would also
not silence that leader, but it would certainly hamper necessary discussion
around their words and actions." (Tweeted on January 5, 2018).

22. The example tweets from @Policy can be used to measure that
Defendant is partisan, rather than neutral, and also that they have acted against
their own policies by suspending, shadowbanning, filtering and/or otherwise
limiting candidates for office and elected officials, as well as their supporters,
staff members, friends, and families, thus limiting the access of those people to
the public forums created by candidates and public officials. Logically, an
elected official and/or candidate for public office is a 'world leader'.

23. As Defendant currently champions and promotes many controversial
speakers (to include Charlie Sheen, Harvey Weinstein, Bill Cosby, Shaun
King, Deray McKesson, James Comey, John Brennan, Barack Obama, Hillary
Clinton and a long list of others), it cannot reasonably claim to maintain a non-
controversial standard nor can Twitter be considered a neutral entity in the
eyes of the law or any reasonable person. At any given time, no less than 16 of
the top 20 trending topics (80%) would be considered controversial by the
average user.

24. Controversy is the very nature of the public forum and the Twitter
space, where the promoted and primary trending topics on the Twitter platform
are almost always controversial and incendiary, which is the very reason users
utilize the platform – Twitter is a space for controversial and difficult

1     discussions, and being as such, it cannot reasonably arbitrate a controversial

2     space based on personal values, and should defer to Law Enforcement to

3     arbitrate 'abuse' under Federal and State Law, and to decline to intervene itself.

4         25. In unilaterally removing Plaintiffs and Others from their open,

5     public platform Defendant seeks to censor them solely based on their

6     political/social viewpoints and perceived affiliations, demonstrating a

7     declarative bias while listed as a neutral public forum.

8         26. Defendant's banning of public speakers due to the controversial

9     nature of their speech and affiliations nullifies the free speech guarantee of the

10     US Constitution. In the words of the late Supreme Court justice Oliver

11     Wendell Holmes, Jr., "if there is any principle of the Constitution that more

12     imperatively calls for attachment than any other, it is the principle of free

13     thought—not free thought for those who agree with us but freedom for the

14     thought that we hate." United States v. Schwimmer, (1929) 279 U.S. 644, 654-

15     655 [49 S. Ct. 448] (dis. opn. of Holmes, J.).

16         27. The loss of the Accounts is a Crippling Blow to Plaintiffs and

17     Others, and presents a Chilling Effect to the First Amendment and other

18     Constitutional Rights, where a Crippling Blow shall be defined as 'an

19     unconscionable and substantial loss with no defined legal remedy or recourse',

20     and a Chilling Effect shall be defined as 'an action which suppresses

21     similar/related rights including but not limited to the First Amendment right to

22     access and utilize a public forum for speech as well as the desire of other users

23     to speak out against similar actions, for fear of action(s) such as censorship,

24     suspension/ban, shadowban or downranking being taken against them as well'.

25         28. Indeed, Plaintiffs regularly spoke out for previously suspended

26     users, especially when the suspensions were wrongful, leading Twitter to

27     unreasonably target them – in turn, Twitter suspended, either permanently or

28     temporarily, the accounts of supporters of Plaintiffs and Others simply for

1  speaking out against existing suspensions which they felt/feel were/are
2  unwarranted. This retaliatiory behavior is unacceptable for a platform which
3  lists itself as neutral, and creates a Chilling Effect.
4       29. The Accounts permitted Plaintiffs and Others to communicate
5  instantly with a broad base of supporters, donors, and readers, as well as
6  campaign in a Federal Election. Plaintiffs and Others used the Accounts to
7  alert their followers to their recent publications, forthcoming conferences,
8  public appearances, articles, videos, podcasts, commentary, speeches, policies
9  and other matters of discourse. This drove traffic to their websites, and kept
10  the ideas of Craig R. Brittain and Brittain for US Senate constantly before the
11  public. In a single month (January 2017), Brittain's tweets were viewed by
12  over 90 million users worldwide.
13       30. The Accounts also supported Plaintiffs' fundraising efforts, vital to
14  both Brittain himself and later to Brittain for US Senate as a principal
15  campaign committee. Indeed, the Accounts were as invaluable way to extend
16  Plaintiffs' reach. Tweets from the Accounts were retweeted well beyond
17  Plaintiffs and Others' own follower bases, leading to continually increasing
18  numbers of followers. New followers, in turn, became supporters and donors
19  of Brittain and Brittain for US Senate.
20       31. There is no public platform comparable to Twitter that allows
21  Plaintiffs and Others to express their views.
22       32. Accordingly, Plaintiffs seek an injunction to prevent Defendant from
23  terminating Plaintiffs and Others' accounts on its public forum and from
24  restricting Plaintiffs and Others' speech in violation of the US Constitution.
25
26
27
28

JURISDICTION AND VENUE

33. Federal Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. §§ 2201–2202.

34. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to this claim occurred in this District.

THE PARTIES

35. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though set forth fully herein.

36. Plaintiff Craig R. Brittain "Brittain" is, and at all relevant times was, a natural person residing in the State of Arizona and County of Maricopa. Due to extensive previous damage to his reputation and troubles in his personal life, he has committed himself to reinventing and rehabilitating his life and image in the previous 5 years. Twitter gave him a means to do this and he gained hundreds of thousands of supporters who supported his cause to receive a real second chance at living a positive and successful life after a felony conviction for Vehicular Eluding in Colorado at age 18 (2002), and running the controversial free speech/adult website Is Anybody Down?, which closed in April of 2013.

37. Since May 2013, Brittain has immersed himself in using his voice for positive change in society, including volunteering for the Republican Party as a Precinct Committeeman and working for campaigns at the Local, State and Federal level, including campaigning and providing influence to President Trump's successful election campaign. His personal effort to rehabilitate himself and his image was working successfully prior to his suspension, as he had acquired the following of a great many public figures/celebrities/politicians (see below).

38. Brittain's primary means of work was via Twitter as a crowdfunded independent journalist and pundit, specializing in documentary-style coverage of protests and political events, notably covering in-person and broadcasting the "January 20", "Travel Ban" and "Black Lives Matter" protests via live stream and Periscope throughout 2016 and 2017. His Periscope broadcasts were viewed over 200 million times.

39. On November 3, 2016, Twitter granted Craig R. Brittain verified/blue check user status, the mark of authenticity granted to accounts associated with celebrities and high profile users, marking his achievements as a political influencer and celebrity. Out of over 3 billion Twitter users, at the time, approx. 150,000 were verified.

40. Brittain has been a lifelong champion of free and even dangerous speech as a natural right. His accumulated total followers (over 400,000) have made him the most popular anarchist/libertarian thinker in world history, where anarchism is defined as 'self-government by peaceful and voluntary interaction and exchange', governed by the Non-Aggression Principle, defined as 'to not harm anyone or their property'.

41. Brittain is a libertarian/anarchist and not a member or supporter of any race, identity or violent extremist groups, he is, however. of mixed Jewish descent and strongly opposed to racism and antisemitism. He is not 'alt-right', 'far right', 'white supremacist', 'racist', etc. The banning of his accounts has lead to impersonators making fake Twitter accounts which have written/posted racist, sexist and other offensive things using his name, as well as the false labels of 'alt-right', 'far right', 'white supremacist' 'racist', etc. which constitute defamation resulting from his perceived vulnerability to Twitter's actions. In turn these fake social media posts have circulated and caused additional damage to his reputation. The best remedy for fake social media posts is a disputing post from an authentic account,

1   as the cure for false speech or 'bad' speech is more speech. Brittain's
2   adversaries dared not spread lies about him while his account was active,
3   instead resorting to blocking or muting his tweets after they had tweeted
4   haphazard and failed attempts to threaten, harass, insult, or defame him to his
5   account.

6       42. Brittain's celebrity/notable followers included but were not limited
7   to Fox News host Sean Hannity, Jenna Jameson, Jenna Marbles, Tyrus
8   (wrestler), EC3 (wrestler), Darren Young (wrestler), Eric D. July and members
9   of the band BackWordz, Phil Labonte of the band All That Remains, Vince
10  Russo, Lauren Southern, Milo Yiannopoulos (before his own suspension),
11  Martin Shkreli, and over 1,700 total users that Twitter deemed to be
12  notable/celebrities and/or worthy of verified/blue check status. His tweets,
13  images and videos were featured on Twitchy, Tucker Carlson/Fox News,
14  Maddow/MSNBC, Breitbart, CNN, and numerous other mainstream outlets
15  and received a total of over 1 billion views on Twitter in 4+ years, receiving
16  over 90 million views in a single month (January 2017). If the full list of
17  followers was not currently hidden by Defendant's acts, an extended list of
18  celebrities could be presented which fully demonstrates the extent of loss
19  incurred by Twitter's suspension of the Accounts.

20      43. Plaintiff Brittain for US Senate is the principal campaign committee
21  for Craig R. Brittain as a candidate for United States Senate in 2018. The
22  purpose of Brittain for US Senate is to promote Craig R. Brittain as a
23  Republican candidate for Federal Office and organize/rally his supporters.

24      44. Defendant Twitter, Inc. is, and at all relevant times was, a
25  corporation duly organized under the laws of the State of Delaware with its
26  principal place of business in San Francisco, California.

27
28

GENERAL/FACTUAL ALLEGATIONS

45. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though set forth fully herein.

### A. Twitter

46. Twitter is a social media platform with more than 330 million estimated active/2.5 billion estimated total users worldwide, including over 80 million estimated active users and 200 million estimated total users in the United States. The platform allows users to publish short messages, to republish or respond to others' messages, and to interact with other Twitter users in relation to those messages. Speech posted on Twitter ranges from personal insult to poetry, but particularly relevant here is that a significant amount of speech posted on the platform is speech by, to, or about the government.

47. Users. A Twitter "user" is an individual who has created an account on the platform. A user can post "tweets," up to 280 characters in length, to a webpage on Twitter that is attached to the user's account. Tweets can include photographs, videos, and links. Some Twitter users do not tweet—i.e., publish messages—at all. Others publish hundreds of messages a day.

48. Timelines. A Twitter user's webpage displays all tweets generated by the user, with the most recent tweets appearing at the top of the page. This display is known as a user's "timeline." When a user generates a tweet, the timeline updates immediately to include that tweet. Anyone who can view a user's public Twitter webpage can see the user's timeline.

49. A Twitter user must have an account name, which is an @ symbol followed by a unique identifier (e.g., @realDonaldTrump), and a descriptive name (e.g., Donald J. Trump). The account name is called the user's "handle." Alongside the handle, a user's webpage will display the date the user joined Twitter and a button that invites others to "Tweet to" the user.

1  button is visible only to other Twitter users.) A user's Twitter webpage may

2  also include a short biographical description; a profile picture, such as a

3  headshot; a "header" image, which appears as a banner at the top of the

4  webpage; the user's location; a button labeled "Message," which allows two

5  users to correspond privately; and a small sample of photographs and videos

6  posted to the user's timeline, which link to a full gallery.

7       50. Tweets. An individual "tweet" comprises the tweeted content (i.e.,

8  the message, including any embedded photograph, video, or link), the user's

9  account name (with a link to the user's Twitter webpage), the user's profile

10  picture, the date and time the tweet was generated, and the number of times the

11  tweet has been replied to (        ), retweeted by (), or liked by (  ) other users.

12       51. By default, Twitter webpages and their associated timelines are

13  visible to everyone with internet access, including those who are not Twitter

14  users. However, although non-users can view users' Twitter webpages, they

15  cannot interact with users on the Twitter platform.

16       52. Following. Twitter users can subscribe to other users' messages by

17  "following" those users' accounts. Users see all tweets posted or retweeted by

18  accounts they have followed. This display is labeled "Home" on Twitter's site,

19  but it is often referred to as a user's "feed."

20       53. Verification. Twitter permits users to establish accounts under their

21  real names or pseudonyms. Users who wanted to establish that they are who

22  they claim to be could previously request that Twitter "verify" their accounts.

23  This process was removed by the Defendant for partisan political reasons, as

24  Twitter verified many notable people via the process who held viewpoints that

25  contrast/dispute the views of Twitter and their staff. When an account is

26  verified, a blue badge with a checkmark appears next to the user's name on his

27  or her Twitter page and on each tweet the user posts.

28

Verified users also receive "priority placement" in trends/hashtags and user timelines, with Twitter displaying Verified user tweets up to 10,000 times each for every view received by a non-Verified user. Verified users can also follow unlimited people per day, as opposed to regular accounts which can only follow 300-1,000 per day, which is another sign of Twitter's partiality. Twitter has also removed numerous verification badges for partisan reasons – a process which is also a Breach of Contract and unconstitutional when it is done to elected public officials and public candidates. The process of removing a verification badge is called "unverifying" or "deverifying" a user. Unverifying/deverifying removes the "priority placement" benefit and the "unlimited follows" benefit.

54. Retweeting. Beyond publishing tweets to their followers, Twitter users can engage with one another in a variety of ways. For example, they can "retweet"—i.e., republish—the tweets of other users, either by publishing them directly to their own followers or by "quoting" them in their own tweets. When a user retweets a tweet, it appears on the user's timeline in the same form as it did on the original user's timeline, but with a notation indicating that the post was retweeted.

55. Replying. A Twitter user can also reply to other users' tweets. Like any other tweet, a reply can be up to 280 characters in length and can include photographs, videos, and links. When a user replies to a tweet, the reply appears on the user's timeline under a tab labeled "Tweets & replies." The reply will also appear on the original user's feed in a "comment thread" under the tweet that prompted the reply. Other users' replies to the same tweet will appear in the same comment thread. Reply tweets by verified users, reply tweets by users with a large number of followers, and tweets that are "favorited" and retweeted by large numbers of users generally appear higher in the comment threads.

56. Comment threads. A Twitter user can also reply to other replies. A user whose tweet generates replies will see the replies below his or her original tweet, with any replies-to- replies nested below the replies to which they respond. The collection of replies and replies-to- replies is sometimes referred to as a "comment thread." Twitter is called a "social" media platform in large part because of comment threads, which reflect multiple overlapping conversations among and across groups of users. Below is a recent @realDonaldTrump tweet that prompted tens of thousands of comments:

57. Favoriting. A Twitter user can also "favorite" or "like" another user's tweet by clicking on the heart icon that appears under the tweet. By "liking" a tweet, a user may mean to convey approval or to acknowledge of having seen the tweet.

58. Mentioning. A Twitter user can also "mention" another user by including the other user's Twitter handle in a tweet. A Twitter user mentioned by another user will receive a "notification" that he or she has been mentioned in another user's tweet.

59. Tweets, retweets, replies, likes, and mentions are controlled by the user who generates them. No other Twitter user can alter the content of any retweet or reply, either before or after it is posted. Twitter users cannot prescreen tweets, replies, likes, or mentions that reference their tweets or accounts.

60. Protected tweets. Because all Twitter webpages are by default visible to all Twitter users and to anyone with access to the internet, users who wish to limit who can see and interact with their tweets must affirmatively "protect" their tweets. Other users who wish to view "protected" tweets must request access from the user who has protected her tweets. "Protected" tweets do not appear in third-party search engines, and they are searchable only on Twitter,

1  and only by the user and their approved followers.

2      61. Blocking. A user whose account is public (i.e. not protected) but

3  who wants to make his or her tweets invisible to another user can do so by

4  "blocking" that user. (Twitter provides users with the capability to block other

5  users, but, importantly, it is the users themselves who decide whether to make

6  use of this capability.) A user who blocks another user prevents the blocked

7  user from interacting with the first user's account on the Twitter platform. A

8  blocked user cannot see or reply to the blocking user's tweets, view the

9  blocking user's list of followers or followed accounts, or use the Twitter

10 platform to search for the blocking user's tweets. The blocking user will not be

11 notified if the blocked user mentions her; nor will the blocking user see any

12 tweets posted by the blocked user.

13     62. If the blocked user attempts to follow the blocking user, or to access

14 the Twitter webpage from which the user is blocked, the user will see a

15 message indicating that the other user has blocked him or her from following

16 the account and viewing the tweets associated with the account. This is an

17 example of a notification from Twitter that a user has been blocked.

18     63. Shadowbanning/Shadowbanned/Shadowban: The Twitter-initiated

19 process of 'ghosting' a user so that some (1%-99% of) or all (100% of) Twitter

20 users cannot see the user's Replies, Tweets, Photos, or other content which

21 they have posted. This includes their Followers, who follow them in order to

22 see their tweets. A large portion of shadowbanning is automated and

23 performed by Twitter's sorting algorithm, integral to the timeline/feed process,

24 and is a key example of subtle bias, where users have stated and provided

25 evidence that politically left-leaning tweets perform better than politically

26 right-leaning tweets by default.

27

28

64. Suspensions/Bans: When a user is suspended/banned temporarily or permanently by Twitter, they are unable to post any Replies, Tweets, Photos or other content, their Followers cannot access their old or new Tweets, and their account is effectively scrubbed from the website, either permanently or temporarily, thus creating large missing pieces in the fabric of the public forums of Twitter, and destroying part of the 'shared history' created by social media annotations.

65. Limits/Filters: When a user is prohibited by Twitter from following other users, posting tweets, etc., the most common are rate limits which restrict the number of fellow users that another user can follow or the number of tweets which can be posted in a single hour, but limits can also include Shadowbanning/Shadowbans. These are unconstitutional because they limit the ability of users to instantly follow/unfollow any new public forum on Twitter as it is being created, and to interact in an unlimited fashion in accordance with the First Amendment.

66. Downrank/Downranking: Defendant pledged to "down rank" popular content which it considers to be "low quality" in the May 28, 2018 revisions to its Terms of Service. This is another form of shadowbanning/limiting in which Twitter is now openly admitting that shadowbanning, which they previously denied, is now an active internal process in which Twitter can pick and decide, in direct violation of popular representation in public forums (A First Amendment guarantee), which Tweets/Replies appear/are read, and which ones are not.

### B. The @realDonaldTrump account

67. Donald J. Trump established @realDonaldTrump in May 2009 and used the account for several years to engage with his followers about politics, celebrities, golf, and his business interests, among other topics. After his

1  inauguration in January 2017, he began to use the account as an instrument of
2  his presidency, and today he and his aides use it almost exclusively as a
3  channel for communicating with the public about his administration. Because
4  of the way he uses the account, President Trump's tweets have become an
5  important source of news and information about the government, and the
6  comment threads associated with the tweets have become important forums for
7  speech by, to, and about the President.

8      68. President Trump presents the account to the public as one that he
9  operates in his official capacity rather than his personal one. The Twitter page
10 associated with the account is registered to Donald J. Trump, "45th President
11 of the United States of America, Washington, D.C." The account bears a blue
12 badge indicating that it has been verified by Twitter. On July 7, 2017, the
13 header photograph showed an American flag. Over the past few weeks, the
14 header photograph has shown images of President Trump performing his
15 official duties, such as making a speech to the Department of Energy, flanked
16 by Vice President Mike Pence and Secretary of Energy Rick Perry.

17     69. The @realDonaldTrump account is accessible to the public at large
18 without regard to political affiliation or any other limiting criteria. President
19 Trump has not "protected" his tweets, and anyone who wants to follow the
20 account can do so. He has not issued any rule or statement purporting to limit
21 (by form or subject matter) the speech of those who reply to his tweets. The
22 account has 53 million followers. The only users who cannot follow
23 @realDonaldTrump are those whom the President and/or his aides have
24 blocked, and those whom Defendant Twitter has permanently or temporarily
25 suspended or limited.

26     70. President Trump and his aides have made clear that they consider
27 statements published on @realDonaldTrump to be official statements of the
28 President. On July 2, 2017, President Trump tweeted from

1  @realDonaldTrump, "My use of social media is not Presidential – it's

2  MODERN DAY PRESIDENTIAL." A month earlier, White House Press

3  Secretary Sean Spicer stated at a press conference that tweets from President

4  Trump should be understood as "official statements by the President of the

5  United States." On June 23, 2017, the White House responded to a request

6  from the House Permanent Select Committee on Intelligence for official White

7  House records by referring the Committee to the President's "statement" made

8  on Twitter on June 22, 2017. The White House social media director, Dan

9  Scavino, promotes @realDonaldTrump, @POTUS, and @WhiteHouse equally

10 as channels through which "President Donald J. Trump . . . communicat[es]

11 directly with you, the American people!" The @WhiteHouse account's

12 description directs Twitter users to "Follow for the latest from @POTUS

13 @realDonaldTrump and his Administration." Further, tweets from @POTUS

14 are frequently retweeted by @realDonaldTrump, and tweets from

15 @realDonaldTrump are frequently retweeted by @POTUS.

16        71. With the assistance of his aides, President Trump uses

17 @realDonaldTrump, often multiple times a day, to announce, describe, and

18 defend his policies; to promote his Administration's legislative agenda; to

19 announce official decisions; to engage with foreign political leaders; to

20 publicize state visits; and to challenge media organizations whose coverage of

21 his Administration he believes to be unfair. President Trump sometimes uses

22 the account to announce official decisions and policies before those decisions

23 and policies are announced through other official channels. For example, the

24 President used @realDonaldTrump to announce on June 7, 2017, for the first

25 time, that he intended to nominate Christopher Wray for the position of FBI

26 director. Likewise, on June 22, 2017, he used @realDonaldTrump to

27 acknowledge for the first time that he did not possess tapes of conversations

28 with former FBI Director James Comey.

72. White House aides assist President Trump in operating the @realDonaldTrump account, including by drafting and posting tweets to the account. According to news reports, President Trump also sometimes dictates tweets to White House Director of Social Media Dan Scavino, who then posts them on Twitter.

73. Federal agencies and the federal courts treat President Trump's statements on @realDonaldTrump as official statements. The National Archives and Records Administration has advised the White House that the President's tweets from @realDonaldTrump, like those from @POTUS, are official records that must be preserved under the Presidential Records Act. The Ninth Circuit cited one of the President's tweets in striking down Executive Order 13,780, the order that temporarily suspends nationals of certain countries from entering the United States. Hawaii v. Trump, 859 F.3d 741, 773 n.14 (9th Cir. 2017), cert. granted sub nom. Trump v. Int'l Refugee Assistance Project, No. 16-1436, 2017 WL 2722580 (U.S. June 26, 2017). In citing the tweet, the Ninth Circuit observed that the White House Press Secretary had indicated that the President's tweets should be treated as official statements.

74. Foreign leaders similarly treat President Trump's statements from @realDonaldTrump as reflective of his views and decisions as President. President Trump's tweets about London Mayor Sadiq Khan and the June 4, 2017 London Bridge terrorist attack ultimately resulted in the indefinite deferral of President Trump's planned state visit to Great Britain. A series of tweets from @realDonaldTrump endorsing the suspension of economic relations with Qatar, a longstanding ally of the United States, prompted a public response from the Qatari Foreign Minister. A series of tweets from @realDonaldTrump insisting that Mexico should pay for a wall along the U.S.–Mexico border caused the Mexican President Enrique Peña Nieto to cancel a previously planned meeting with President Trump shortly after his

1    inauguration.

2       75. Because of the way in which President Trump uses

3    @realDonaldTrump, the account has become an important channel for news

4    about the presidency and the U.S. government. Those who are blocked,

5    suspended from Twitter or otherwise unable to access the account are impeded

6    in their ability to learn information that is shared only through that account.

7       76. The comment threads associated with tweets from

8    @realDonaldTrump are important forums for discussion and debate about the

9    President, the President's decisions, and government policy. Typically, tweets

10   from @realDonaldTrump generate thousands of replies, some of which

11   generate hundreds or thousands of replies in turn. The @realDonaldTrump

12   account is a kind of digital town hall in which the President and his aides use

13   the tweet function to communicate news and information to the public, and

14   members of the public use the reply function to respond to the President and

15   his aides and exchange views with one another.

16               C. Censorship and the First Amendment

17       77. Twitter states: "We believe in free expression and believe every

18   voice has the power to impact the world." Twitter describes itself as "the live

19   public square, the public space - a forum where conversations happen."

20   Twitter's CEO, Jack Dorsey, has stated, "Twitter is a communication utility." It

21   allows users who have established accounts to post short messages, called

22   Tweets, as well as photos or short videos. Anyone can join and set up an

23   account on Twitter at any time.

24       78. Twitter is the platform in which important political debates take

25   place in the modern world. The U.S. Supreme Court has described social

26   media sites such as Twitter as the "modern public square." Packingham v.

27   North Carolina (2017) 582 U.S. [137 S. Ct. 1730, 1737]. It is used by

28   politicians, public intellectuals, and ordinary citizens the world over,

expressing every conceivable viewpoint known to man. Unique among social media sites, Twitter allows ordinary citizens to interact directly with famous and prominent individuals in a wide variety of different fields. It has become an important communications channel for governments and heads of state. As the U.S. Supreme Court noted in Packingham, "[O]n Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. Indeed, Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose. In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." 137 S. Ct. at pp. 1735—36 (internal citations and quotations omitted). The Court in Packingham went on to state, in regard to social media sites like Twitter: "These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'" Reno v. ACLU (1997) 521 U. S. 844, 870 [117 S.Ct. 2329].

79. It is universally understood that Tweets reflect the viewpoints of the user who posted the Tweet, and not Twitter itself. All Tweets are clearly identified with the user who posted the Tweet. Indeed, Twitter clearly states in its Terms of Service: "You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations."

80. It goes on to state: "You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your photos and videos are part of the Content)." Id.  Twitter and its executives have numerous accounts which they use to publish their own viewpoints on the platform. Tweets are published by individual users, not Twitter, except for tweets from Defendant's official

1  company accounts such as but not limited to @Policy, @TwitterSupport and

2  @TwitterSafety.

3      81. For 5 years, Plaintiff Craig R. Brittain "Brittain" has been a well-

4  known influencer and independent journalist, primarily focusing on politics,

5  protest movements, and free speech. He has been interviewed countless times

6  by national/international print/electronic media on free speech and journalism.

7      82. Brittain takes the view that centralized government is unnecessary

8  for society. He argues that the evidence shows that society functions better

9  under self-government than under the rule of the state. He believes that all

10 people have the natural right to secede and that secession does not create an

11 impermissible state of anarchy or chaos, as Canada resides peacefully on the

12 US border(s).

13     83. Brittain originally joined Twitter in 2009, with his primary verified

14 account being registered in 2013. The verified @CraigRBrittain account had

15 over 150,000 followers at the time of its suspension on February 1, 2017. The

16 @AuditTheMedia account had 106,000 followers at the time of its suspension

17 on February 2, 2017. The @SenatorBrittain (Brittain for US Senate) account

18 had 118,000 followers at the time of its suspension on March 30, 2018. The

19 accounts of Brittain's staff members totaled over 32,000 combined followers at

20 the time of their suspensions on May 23, 2018.

21     84. Over the course of over five years, Plaintiffs and Others invested

22 countless hours and significant time and effort into cultivating a large follower

23 base and Twitter presence for the Accounts that would generate new

24 supporters.

25     85. At the time Plaintiffs and Others joined Twitter, there was no

26 provision in Twitter's Terms of Services that permitted it to suspend or

27 terminate accounts for any or no reason.

28

86. On May 17, 2015, Twitter amended its Terms of Service to read: "We may suspend or terminate your accounts or cease providing you with all or part of the Services at any time for any or no reason."Twitter's current Terms of Service include this same language.

87. The provision allowing Twitter to terminate a user "at any time for any or no reason" is unconscionable as it materially violates the First Amendment right to hear and access a public forum.

88. These terms were unilaterally added by Twitter after Plaintiffs and Others joined the platform without their knowledge or consent, and purport to allow Twitter to unilaterally cancel and destroy the benefit of its bargain with Plaintiffs and Others for arbitrary, capricious, discriminatory or illegal reasons, without affording Plaintiffs and Others any rights or remedies and purporting to cancel any rights or remedies they might have legally held.

89. The Twitter Terms of Service state: "We may revise these Terms front time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at twitter.com/tos, will govern our relationship with you. We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account."

90. On February 1, 2017, February 2, 2017, March 30, 2018, and May 23, 2018, Defendant suspended the Accounts without explanation in what is presumed to be an automated process. Plaintiffs and Others immediately appealed the suspensions. Twitter replied via automated email that the suspensions were permanent because the Accounts were connected to a user who was previously suspended (the @CraigRBrittain account). Twitter did not specify any actual violations of the rules or contract. Plaintiffs and Others immediately sent emails to Twitter expressing astonishment at the reason given for the permanent suspensions and seeking clarification,

1  but Twitter did not provide a human reply, as all correspondence via Twitter's
2  Customer Service system is automated. To be clear, there is no proof that a
3  human decided that Plaintiffs and Others broke any rules, nor is there any
4  specific claim of violation of Twitter's Terms of Service by the Defendant.

5                    D. Twitter as Biased, Partial Moderator

6       91. As Twitter has randomly and permanently suspended members of its
7  own staff to include the automated suspension of its own CEO Jack Dorsey
8  (@jack) on November 23, 2016, it can be concluded that Twitter itself does not
9  properly manage the suspension process, likewise the fallibility/credibility of
10 the process of suspending an account itself cannot be proven, thus all existing
11 suspensions should be overturned and re-examined by humans, rather than
12 automated process(es).

13      92. On November 3, 2017, The 45th President of the United States,
14 Donald J. Trump (@realDonaldTrump) had his account suspended by an
15 alleged "rogue employee" for 11 minutes, but many commentators concluded
16 that it was actually a "test run" or "experiment" to see what would happen if
17 Twitter suspended the President of the United States. If the President of the
18 United States can be suspended from a platform, either temporarily or
19 permanently, it creates a widescale Chilling Effect and Crippling Blow for
20 supporters of the President as well as anyone with an interest in free speech on
21 social media. This likewise constitutes a recursive denial of the President's
22 ability to create a public forum, a violation of the First Amendment rights of
23 the President of the United States of America.

24      93. As Knight First Amendment v. Trump concluded, President Trump's
25 tweets are a public forum on Twitter, and being that is the case, then Twitter
26 likewise has a recursive responsibility to provide access to the public forums
27 provided by the President himself and all other elected officials and public
28 candidates, as well as all of their followers without limit, suspension, ban, etc.

1  to use the Twitter-created public forum to conduct speech, where Law
2  Enforcement shall have rightful and proper jurisdiction over public forums,
3  and any violations of the US legal code shall be handled by the proper
4  authorities rather than Twitter staff, who have no rightful control over a public
5  forum other than as commentators.

6      94. On July 19, 2016, Twitter permanently suspended Breitbart
7  journalist Milo Yiannopoulos (@Nero) over tweets written by some of his
8  random followers to actress Leslie Jones. Milo was alleged to be culpable even
9  though his tweets were the simple criticisms "barely literate, looks like a man,
10 [her work] isn't very good", not different from those regularly directed towards
11 the President of the United States or any other public figure. However, some
12 random followers with no association or relationship with or to Milo
13 Yiannopoulos tweeted things which could be considered racist towards Leslie
14 Jones. Twitter stated that the tweets of these random followers were the reason
15 for Milo's permanent suspension. It has been almost 2 years and his account
16 has not been restored – it is unreasonable to deny access to a public forum for
17 over 2 years.

18     95. On December 28, 2016, after the death of actress Debbie Reynolds,
19 actor Charlie Sheen tweeted: "Dear God, Trump next please!" The tweet was
20 featured on the front page of the Twitter website, endorsed by Twitter as a
21 company, and it has received over 57,000 retweets and over 111,000 "likes".
22 Many of the replies to the tweet include direct threats to the President of the
23 United States. Charlie Sheen's Twitter account was not suspended, and the
24 tweet continues to be promoted and endorsed by Twitter.

25     96. Celebrity YouTuber Sky Williams (@SkyWilliams) was permanently
26 banned on April 23, 2018, for responding to a tweet and telling a person who
27 was tweeting very derogatory things to "kick rocks". His account was later
28 restored, but no formal apology was issued by Twitter for their mistake.

97. On May 12, 2016, musician Azealia Banks (@AzealiaBanks) was given a permanent Twitter suspension for criticizing One Direction member (at the time) and musician Zayn Malik, a public figure and celebrity. Her account has not been restored in over 2 years.

98. On February 11, 2018, Paul Nehlen (@pnehlen), a candidate for Federal Office in Wisconsin, was permanently suspended from Twitter over accusations of apparent antisemitism. While antisemitism is wrong and abhorrent, it should not constitute removal from a public forum, as all candidates for political office have the right to express their views, no matter how offensive or absurd they might be. His account has not been restored.

99. On February 21, 2018, Twitter conducted a massive temporary suspension of several million accounts, without advance notice or proper reasoning, in violation of their Terms of Service. This was a Breach of Contract in which millions of users were required to complete multiple CAPTCHA tests and phone verification in order to access their accounts. This was documented in the trending hashtag #TwitterLockout.

100. On January 11, 2018, independent investigative journalism group Project Veritas (@Project_Veritas) and James O'Keefe III (@JamesOKeefeIII) released a video in which current and previous Twitter employees disclose(d) the existence of "shadowbanning" affecting over 150 million accounts on the platform, which is a direct Breach of Contract.

101. On April 13, 2018, Twitter permanently suspended the account of street artist Sabo (@unsavoryagents), based on art he had created in the real world. His account has not been restored.

102. On January 8, 2017, Twitter permanently suspended CEO Martin Shkreli (@MartinShkreli) for parody photos he created of himself and Teen Vogue journalist Lauren Duca. The account has not been restored.

103. On May 28, 2015, Twitter permanently suspended journalist Chuck Johnson (@ChuckCJohnson) for crowdsourcing money for a 'hit piece' of critical journalism against Deray McKesson (@deray). Deray McKesson falsely alleged via his Twitter account that Chuck Johnson was threatening his life. No police report was ever filed by Mr. McKesson, and thereby logically, Mr. McKesson knew that the police would not interpret Mr. Johnson's tweet as a threat. However, because of Deray McKesson's intimate personal relationship with Twitter CEO Jack Dorsey (having been invited to Twitter's HQ on a semi-regular basis), Mr. McKesson was able to have Mr. Johnson permanently suspended, and this is the third year where Mr. Johnson has been denied access to the public forums of Twitter.

104. On November 15, 2017, Twitter removed the verification badge/blue check of Jewish independent journalist Laura Loomer (@LauraLoomer), alleging that she was a white supremacist, Nazi, or connected to a hate group, without evidence. This is another form of breach of contract and censorship. The verification badge has not been restored.

105. On January 2, 2018, Twitter removed the verification badge/blue check of Wisconsin Sheriff David Clarke (@SheriffClarke) for posting what they alleged were "violent threats". However, Law Enforcement would logically conclude as they were not aimed at anyone in particular, the metaphors used were merely figures of speech. The verification badge has not been restored.

106. On April 16, 2018, Documentary director/producer and author Mark Dice's Twitter account (@MarkDice) was temporarily suspended, and he was forced to delete a tweet in which he stated that there are only two genders. His account was then restored.

107. On October 29, 2017, Twitter permanently suspended the account of political adviser and public figure Roger Stone (@RogerJStoneJr) for using

profane language while criticizing several journalists. His account has not been restored.

108. On August 30, 2017, Twitter permanently suspended the account @nemuismywife, owned by a man who killed a mosquito that had been bothering him, and then tweeted: "Where do you get off biting me all over while I'm just trying to relax and watch TV? Die! (Actually you're already dead)." He added a picture of the dead insect to his tweet. The account has not been restored.

109. On March 28, 2018, Twitter permanently suspended Tommy Robinson (@TRobinsonNewEra) over a speech he gave in the real world about Islam and radical Islamic terrorism. This suspension is completely unconstitutional because he is being suspended for speech made in a public forum. His account has not been restored.

110. On August 15, 2017, Twitter permanently suspended Carl Benjamin, better known by his online username Sargon of Akkad (@Sargon_of_Akkad), for videos he made on his YouTube channel criticizing Islam. His account has not been restored.

111. On August 31, 2016, YouTuber PewDiePie (@pewdiepie), real name Felix Kjellberg, was stripped of his Twitter verification checkmark and temporarily suspended from Twitter for making a joke about "joining ISIS". He was forced to delete the joke. His verification checkmark was not restored until 2018.

112. On April 5, 2018, comedian Owen Benjamin was permanently suspended from Twitter after criticizing public figure/activist David Hogg. His account has not been restored. Mr. Benjamin wrote on his Facebook page: "Both twitter accounts suspended and now my ability to make an income has been revoked. Please become a [Patreon link] supporter. That will be place I can post things.

1   This is disgusting. I have a two year old and a pregnant wife and they just set
2   my life back to 0 with on big swoop. I just worked tirelessly for the last 5
3   months building my online ability to make a living and it's all gone. You will
4   be next. Fight it now."
5        113. On September 1, 2017, a black activist from Atlanta, Georgia who
6   uses the online aliases "Charlie Peach" and "Peach Politics"  was falsely
7   labeled as a Russian agent and her Twitter account, @PeachPolitics, was
8   permanently suspended. She says that in part it was because she criticized
9   other prominent activists like Deray McKesson. Her Twitter account has not
10  been restored.
11       114. On August 22, 2016, Twitter suspended the popular professional-
12  wrestling "GIF account" which posted animated videographic images,
13  @DeathToAllMarks. It has not been restored.
14       115. On April 20, 2018, Twitter suspended @FootballUGA, the
15  University of Georgia Football team's Twitter account, over false copyright
16  claims regarding content which it legitimately owns. The account was restored
17  after one week of downtime.
18       116. On December 18, 2017, Twitter permanently suspended Egyptian
19  journalist Wael Abbas (@WaelAbbas). His account has not been restored and
20  his suspension is being used by the government of Egypt in order to label him
21  as an extremist and potential insurgent/terrorist. This is one of the
22  consequences of Twitter's censorship - The idea that an individual may face
23  criminal consequences from their government over the suspension of their
24  Twitter account shocks the conscience.
25       117.  On March 14, 2018, comedian Steven Crowder (@scrowder)
26  received a one-week ban from Twitter for sharing a comedy video he made on
27  Twitter via a YouTube link, in which he told jokes at a "gender fluidity" event.
28

118. Twitter openly admits that it cannot correctly gauge the political stances of its users. On April 27, 2018, CEO Jack Dorsey apologized for falsely labeling conservative commentator Candace Owens as "far right" in a promoted trend. This was a direct public admission of the lack of neutrality at Twitter, as well as Breach of Contract.

119. Numerous notable/verified people who use Twitter have noted instances of shadowbanning/downranking.

120. On January 29, 2018, Indian professor Madhu Purima Kishwar (@madhukishwar) tweeted: "I have been informed that @TwitterIndia has put my handle under #ShadowBan . Therefore, my tweets not reaching my followers. My average increase of followers used to be 2500 to 3000 per day. Now stagnant & my posts being #ShadowBanned . @TwitterSupport". Ms. Kishwar has over 2 million followers, and less than 1% of them were able to see her tweet.

121. On May 23, 2018, independent journalist Tim Pool (@timpool) tweeted: "Can Twitter shadowban people for their political views if they are responding to the @realDonaldTrump. I'm really interested to see the ramifications of this. Does this turn Twitter into a privately owned public space?"

122. On May 15, 2018, Breitbart journalist Allum Bokhari (@LibertarianBlue) tweeted: "Twitter lied to the Senate. They told @tedcruz they don't shadowban, and yet: 1. Their employees were caught on camera by @Project_Veritas, admitting to it 2. They have announced that they will hide content w/o telling users GOP must call them out."

123. On May 22, 2018, actor and professor James Marchese (@JLMarchese111) tweeted: "Bill my impressions dropped from over a million a month to 150,000 after Twitter suspended my account for "hate speech" aka retweeting an article on immigration impact in Europe.

1    #Shadowban #censorship is real."

2         124. On May 12, 2018, independent journalist Wayne Dupree

3    (@WayneDupreeShow) tweeted: "Twitter, why the shadowban since

4    December? Why am i not allowed to reach the people that follow me".

5         125. On January 13, 2018, video game developer Mark Kern

6    (@Grummz) tweeted: "Today, someone tried to get me fired for tweeting

7    against Twitter's shadowban policy and for using the term SJW. Yes, there

8    really are horrible, petty and small minded people out there. They are called

9    SJWs." On April 9, 2018, Mr. Kern also tweeted: "Twitter testified before

10   congress that they suppress tweets. They just disagree about calling it

11   "shadowbanning" or that it is biased."

12        126. On April 6, 2018, journalist David Reaboi (@davereaboi) tweeted:

13   "WHOAH—> is .@tedcruz being "shadowbanned" by Twitter? @jimgeraghty

14   takes a look. It sure looks that way." Ted Cruz is a current US Senator from

15   Texas, previous Presidential candidate, and his tweets constitute a public

16   forum in the same way that President Donald J. Trump's tweets constitute a

17   public forum.

18        127. On December 31, 2016, University of New Mexico professor Nick

19   Flor (@ProfessorF) tweeted: "When Twitter first started cracking down on

20   GG, my impressions were cut in half. They definitely shadowban based on

21   tweets & association."

22        128. On October 1, 2016, Nicholas Sarwark (@nsarwark), candidate for

23   Mayor of Phoenix and chairman of the Libertarian National Committee (LNC,

24   Libertarian Party), tweeted: "Since @twitter has me on a #shadowban, I wrote

25   a post about it on @facebook (which has verified my account)."

26

27

28

129. On February 16, 2016, journalist and YouTuber Lauren Southern (@Lauren_Southern) tweeted: ""For site owners, the ideal shadowban is when a user never realizes he's been shadowbanned" this is why some of you can still see our posts."

130. On June 1, 2018, Boston Herald journalist Adriana Cohen (@AdrianaCohen16) tweeted: ".@jack @TwitterSupport Can you explain why my Conservative opinion columns get minuscule traction on Twitter but 48,000 shares on @facebook? This recent column went viral. @USATODAY picked it up & many other MSM. http://www.bostonherald.com/news/columnists/adriana_cohen/2018/05/democ rats_russia_truth_coming_out ... #ShadowBanning @GOP @foxandfriends #MAGA"

131. On May 23, 2018, TV host and Playboy Playmate Dalene Kurtis (@DaleneKurtis) tweeted: "Twitter 1st Amendment violation - WATCH VIDEO: @JamesOKeefeIII @Project_Veritas #DEEPSTATE #ExposeTheWicked #ShadowBanning conservatives, "Free Thinkers". #PatriotsFight #EndWitchHunt #Bored with this bullsh*t."

132. On May 15, 2018, professor and activist Mar Hicks (@histoftech) tweeted: ""When Twitter's software decides a certain user is "detract[ing] from the conversation," all of that user's tweets will be hidden from search results & public conversations until their reputation improves. And they won't know that they're being muted in this way" #ShadowBanning" she continued in a second tweet: "Problem is, Twitter's already been lowkey doing this--it's called shadowbanning, & guess what? Twitter doesn't do it to white nationalists & misogynistic jerks--they do it to activists & POC."

133. On April 2, 2018, Newsmax/The Rebel journalist John Cardillo (@johncardillo) tweeted:".@michellemalkin has 2.1M followers, only 104 RTs on this. #Shadowbanning".

134. On March 16, 2018, Federalist editor/journalist Robert Tracinski (@Tracinski) tweeted: "So we get shadowbanning, and totally arbitrary Twitter suspensions, and Twitter throttling the traffic of people they don't like and controlling what articles you can and can't tweet links to."

135. On March 9, 2018, The Canary journalist Steve Topple (@MrTopple) tweeted: "Twitter is stopping disabled activists from fighting for their human rights. Everyone should know about this.

My article on the '#ShadowBanning' of @NicolaCJeffery, @paulapeters2, @depresseddawg74 & @BobEllard1 of @Dis_PPL_Protest.

READ AND SHARE WIDELY:

https://www.thecanary.co/opinion/2018/03/09/twitter-stopping-disabled-activists-fighting-human-rights-everyone-know/"。

136. On March 3, 2018, independent journalist Bill Mitchell (@mitchellvii) tweeted: "Twitter #ShadowBanning?  Today it took me 237 tweets to achieve fewer impressions than 90 tweets 2 weeks ago.  That folks, is shadow banning. My whole team at YourVoice™ America has seen their impressions per tweet cut in half over the past two weeks."

137. On October 27, 2017, journalist and author Violet Blue (@violetblue) tweeted: "Here's a good explanation of the shadowbanning that Twitter is ramping up on sexuality-related accounts (site NSFW): http://www.erosblog.com/2017/10/27/to-survive-the-pornocalypse-share-our-shit-saturdays-soss/"。

138. On April 14, 2017, Dilbert creator Scott Adams (@ScottAdamsSays) tweeted: "Is Twitter shadowbanning my tweets? Twitter says no. My followers say yes."

139. On October 6, 2017, Comedian Corinne Fisher (@PhilanthropyGal) tweeted: "FYI Twitter is now shadowbanning ppl who have views they don't agree with, but rape threats any time I talk about sexual

are fine."

140. On April 9, 2018, Donald Trump Jr. (@DonaldJTrumpJr:) tweeted: "I'm sure they're not doing anything with their algorithms to block or stymie conservative thought!?! #amiright". On May 10, 2017, Donald Trump Jr. also tweeted: "Amazing that numerous people told me @twitter censored this tweet but not the stuff you savages (endearing form of the word) put up daily!?!"

141. On May 25, 2018, author Piper Kerman (@Piper) tweeted: "Hello, @TwitterSupport. Please remove the shadow ban on @brownblaze. WTF".

142. On May 11, 2018, activist Eva Nagao (@evanagao) tweeted: "When you shadow ban a user, their followers can see their tweets, but their tweets don't appear under hashtags they use, or in a general search of their handle by non-followers. Why is @prisonculture under a shadow ban @TwitterSupport?"

143. On February 21, 2018,  Republican Mayoral candidate Angelo Ray Gomez (@AngeloRayGomez) tweeted: "I am really REALLY starting to get pissed at the blatant attack on Trump Supporters & the discrimination we are receiving. Someone needs to say something about this. About the shadow ban on social media, the physical attacks, ANTIFA, college campus discrimination."

144. On January 29, 2018, Jenna Jameson (@jennajameson) tweeted: "Why would twitter shadow ban little ole me?"

145. On January 16, 2018, Project Veritas (@Project_Veritas) tweeted: "Question we'd like to see asked at Senate Terrorism and Social Media: #IsBigTechDoingEnough hearing tomorrow: Is @Twitter shadow banning terrorists as actively as they shadow ban those strongly opposed to terrorism?"

146. On May 23, 2018, political commentator and Turning Point USA founder Charlie Kirk (@charliekirk11) tweeted: "Wait, @realDonaldTrump is not allowed to block accounts but @Twitter is allowed to shadow-ban

conservatives, delete tweets, terminate accounts, censor material, and block opposing views?'"

147. On February 20, 2018, commentator Candace Owens (@RealCandaceO) tweeted: "Twitter is currently purging the followers on conservative accounts only. I just lost 3000 followers in one minute. Check out the trending hashtag to confirm that it is ONLY conservative accounts that are being affected. Holding for an explanation...". On January 15, 2018, Owens also tweeted: "I am blocked by this account. What about you guys? #shadowban @Project_Veritas @JamesOKeefeIII"

148. On January 12, 2018, actor James Woods (@RealJamesWoods) tweeted:"#ShadowBan HOW TWITTER CENSORS CONSERVATIVE CONTENT: THE SHADOW BAN. The idea of a shadow ban is that you ban someone, but they don't know that they've been banned, because they keep posting, but nobody sees their content. So they just think that no one is engaging with their content, when in reality, no one is seeing it."

149. On March 14, 2018, President Donald Trump's Campaign Manager, Brad Parscale (@parscale) tweeted: "We won't tolerate bias toward conservatives or @realDonaldTrump supporters. We're standing up for you and demanding answers. @GOPChairwoman and I have sent the following letter to @facebook's Mark Zuckerberg and @Twitter's @jack Dorsey. #StopTheBias". The letter includes the following: "Twitter claims its tools are free from political bias, but has allegedly targeted predominantly Republicans as part of a 'shadow banning' practice, which covertly limits those accounts' visibility on the platform."

150. Millions of unnamed people of all political viewpoints with no celebrity profile/status have also been suspended – an estimated total of over 5 million "average" or "reasonable person" users and over 15 million accounts in the past 5 years.

151. Millions of actual abusers/people who openly violated the Twitter rules have not been suspended. A simple Twitter search which includes any variation of the following words: "kill", "die", "assassinate", "suicide", "rape", "stab", "shoot", "bomb", "fire", or any conceivable words associated with violence, will produce innumerable results in the form of tweets by non-suspended accounts which clearly violate Twitter's Terms of Service.

152. Twitter has admitted on multiple occasions that it makes mistakes, both human and automated, which it must be held accountable for, to include but not limited to the mistakes alleged in this suit, both active/deliberate and passive/negligent.

153. On March 8, 2018, @TwitterSupport tweeted: "We have a number of systems to monitor and review content on Twitter, from safe search to spam. We were recently alerted to an issue where some accounts were caught in these measures for longer than intended, limiting their visibility to people who didn't follow them."

154. On December 22,  2017, @TwitterSupport tweeted: "We've identified a bug that incorrectly marked accounts as containing sensitive media, limiting the visibility of Tweets from affected accounts. We believe the issue has been resolved. If you are still seeing an issue with your account please reply here so we can investigate." This is an admission by Twitter of their negligence and reckless disregard with respect to the Terms and Conditions/Contract of use for their public forum. Defendant cannot tell if users have been affected – negligence.

155. On November 15, 2017, @TwitterSupport admitted via tweet: "Verification has long been perceived as an endorsement. We gave verified accounts visual prominence on the service which deepened this perception. We should have addressed this earlier but did not prioritize the work as we should have. We are conducting an initial review of verified accounts and will remove

1   verification from accounts whose behavior does not fall within these new

2   guidelines. We will continue to review and take action as we work towards a

3   new program we are proud of." This admission details how viewpoint

4   discrimination was re-applied to the verification process on Twitter, and how

5   unverifying/deverifying users is an active process of viewpoint discrimination.

6          156. Twitter regularly camouflages its censorship by alleging abuse via

7   @TwitterSupport and @TwitterSafety. When the unconscionable and

8   extremely biased perspective of @TwitterSafety is removed from its tweets

9   and replaced with a reasonable person's interpretation of what actually

10  happened, viewpoint discrimination becomes apparent.

11         157. On October 30, 2017, @TwitterSafety tweeted: "There's been

12  confusion around the recent suspension of Roger Stone's account because we

13  weren't clear enough. So we wanted to explain what happened, and our

14  decision. Roger Stone's account was permanently suspended for violating our

15  Abusive Behavior policy multiple times this year. His Tweets targeted

16  individuals with harassment, indirect violent threats, and encouraged others to

17  harass these individuals." No police reports were filed for harassment and/or

18  threatening behavior, thereby the allegation is not only unfounded but

19  potentially defamatory (this suit does not allege defamation) in the case that

20  Twitter as a company knew that Roger Stone was not actually harassing or

21  threatening anyone, but rather politically criticizing public figures in a harsh

22  but acceptable manner for a public forum, and decided to knowingly render a

23  false public statement about Mr. Stone in an official press release. The

24  responses to Twitter's decision by ordinary, reasonable people were

25  overwhelmingly negative and critical. Thus, this is an admission by Twitter

26  that they portray viewpoint censorship as solving behavioral problems in order

27  to skirt fair critique (and legal grounds) regarding their public forum, as is

28  alleged here. (Moving the goalposts when convenient.)

158. On March 1, 2018, Twitter CEO Jack Dorsey (@jack) admitted that Twitter should be held accountable for censoring users via tweets: "We're committing Twitter to help increase the collective health, openness, and civility of public conversation, and to hold ourselves publicly accountable towards progress. Why? We love instant, public, global messaging and conversation. It's what Twitter is and it's why we're here. But we didn't fully predict or understand the real-world negative consequences. We acknowledge that now, and are determined to find holistic and fair solutions. We've focused most of our efforts on removing content against our terms, instead of building a systemic framework to help encourage more healthy debate, conversations, and critical thinking. This is the approach we now need." Twitter's primary focus as admitted by their CEO is the removal of tweets. Almost 100% of the responses to Jack Dorsey's tweets on March 1, 2018 were negative/critical, including many users who asked Dorsey to overturn existing suspensions and stop participating in viewpoint discrimination.

159. Twitter does not have a human appeals system as part of their Customer Service/@TwitterSupport/@TwitterSafety system. Rather, the existing system is entirely automated, and automatically rejects appeals. Thus, even a user who has been suspended via a bug has to rely on the hopes that they have a connection who works at Twitter, or that members of the public who aren't suspended take up their cause and that the Defendant listens to them by proxy. The actual suspensions are handled by members of other departments, such as Twitter VP "Del Harvey" (@delbius), a person who operates using a false name in order to avoid public accountability.

160. When Milo Yiannopoulos (@Nero) was suspended on July 19, 2016, over 200,000 users tweeted in the hashtag #FreeMilo, but his account was not restored. When actress Rose McGowan (@RoseMcGowan) was suspended from Twitter on October 12, 2017, 60,000 users tweeted for her

1   account to be restored, and it was re-enabled within 6 hours. This presents a

2   clear double standard where the voice of the reasonable public is ignored on

3   Twitter, thus Twitter manages its public forums with complete reckless

4   disregard for the average user and their First Amendment rights.

5        161. Therefore, logically, it can be assessed by a(ny) reasonable person

6   that Twitter is not and cannot be a Good Faith manager or neutral

7   arbiter/arbitrator of its public forums, has admitted so publicly via its CEO

8   Jack Dorsey (@jack) and company accounts (to include @TwitterSupport,

9   @TwitterSafety and @Policy) and that its enforcement of its Terms and

10  Conditions is inconsistent, selective and subject to incontrovertible bias. This

11  honorable Court should act based on all of the information listed in this

12  complaint, and rightly award injunctive and declarative relief.

13              E. Knight First Amendment Center v. Trump

14       162. The Southern District of New York Court concluded the following

15  in Knight First Amendment Center v. Trump (17 Civ. 5205):

16       163. President Trump and Twitter's actions induced a " legally

17  cognizable injury".

18       164. "We hold that portions of the @realDonaldTrump account -- the

19  "interactive space" where Twitter users may directly engage with the content of

20  the President's tweets -- are properly analyzed under the "public forum"

21  doctrines set forth by the Supreme Court, that such space is a designated public

22  forum, and that the blocking of the plaintiffs based on their political speech

23  constitutes viewpoint discrimination that violates the First Amendment."

24       165. "We conclude that we have jurisdiction to entertain this dispute.

25  Plaintiffs have established legal injuries that are traceable to the conduct of the

26  President and Daniel Scavino and, despite defendants' suggestions to the

27  contrary, their injuries are redressable by a favorable judicial declaration.

28  Plaintiffs lack standing, however, to sue Sarah Huckabee Sanders, who is

1   dismissed as a defendant. Hope Hicks is also dismissed as a defendant, in light
2   of her resignation as White House Communications Director. Turning to the
3   merits of plaintiffs' First Amendment claim, we hold that the speech in which
4   they seek to engage is protected by the First Amendment and that the President
5   and Scavino exert governmental control over certain aspects of the
6   @realDonaldTrump account, includinq the interactive space of the tweets sent
7   from the account. That interactive space is susceptible to analysis under the
8   Supreme Court's forum doctrines, and is properly characterized as a
9   designated public forum. The viewpoint-based exclusion of the individual
10  plaintiffs from that designated public forum is proscribed by the First
11  Amendment and cannot be justified by the President's personal First
12  Amendment interests. In sum, defendants' motion for summary judgment is
13  granted in part and denied in part, and plaintiffs' cross-motion for summary
14  judgment is granted in part and denied in part."

15          F. Electronic Frontier Foundation Amicus Curiae Brief on Knight First
16                          Amendment Center v. Trump

17

18          166. EFF Attorney Mitchell L. Stoltz penned all of the following:
19                              "INTRODUCTION
20          a. President Trump's use of @realDonaldTrump to announce U.S. policy
21  and communicate directly with the American people is just one example of
22  how Twitter and other social media are widely used by officials and agencies
23  at all levels of government across the country. Social media has proved to be
24  an efficient way for government to communicate vital information to the
25  public. Indeed, as was seen with recent spate of natural disasters, social media
26  serves critical public safety purposes. It is not surprising that some private
27  social media platforms are specifically designed for such purposes.

28

b. Given the pervasive use of social media, this Court must recognize that individuals have First Amendment rights both to receive governmental messages transmitted through social media as well as to participate in the communicative forums created by them. And this Court must find that the President's viewpoint-based blocking of the plaintiffs burdens their First Amendment rights, and is thus unconstitutional.

c. President Trump's use of Twitter has familiar historical analogs. Past U.S. Presidents adopted new communication technologies to engage directly with the public. FDR's Fireside Chats were delivered directly into Americans' homes by radio.

d. Eisenhower broadcast Presidential announcements on public access television. And starting with the 1960 election, Presidential candidate debates were televised as well. And what was so obvious with those historic analogs, should be as obvious now. It would have been plainly impermissible for the President to punish certain individuals by making it more difficult for them to get these broadcasted messages than every other American. A court surely would have rejected a President's attempt to get a court order barring all broadcasters from momentarily delivering their signal to certain viewers disfavored by the President.

e. The result should be no different merely because social media platforms make such blocking so easy. What might have required a court order before is now easily accomplishable as a feature of the platforms. But the effect remains the same: disfavored citizens are punished.

I. SOCIAL MEDIA HAS BEEN WIDELY ADOPTED BY GOVERNMENTAL AGENCIES AND OFFICIALS AT ALL LEVELS TO COMMUNICATE TO AND WITH THEIR CONSTITUENTS.

f. Governments all over the country – indeed, all over the word – use various social media platforms to disseminate important information to the public, and to debate the policies of the day with each other and with their constituents, all in a rapid and freely accessible manner.

In 2016, a United Nations study on the use of social media and other web-based tools for the delivery of government services online and for the participation of the public, reported that 152 member states out of 193 (roughly 80%) include links to social media and other networking features on their national websites. U.N. Department of Econ and Soc. Affairs, United Nations E- Government Survey 2016: E-Government in Support of Sustainable Development, at 65, U.N. Sales No. E.16.II.H.2 (2016).5 And 20 percent of member states reported that engagement through social media led to new policy decisions and services. Id. at 68. Social media was viewed as a low-cost, ready-made solution for posting basic public-sector information and for citizen collaboration, regardless of a country's economic level.

g. In the last decade as the use of social media has grown generally, the political use of social media has increasingly factored in U.S. national and state elections, the legislative process, and how government agencies offer services to the public. Over 10,000 social media profiles for U.S. federal agencies and sub-agencies have been registered with the United States Digital Service.6 And that impressive number is an underestimate since many agencies remain unregistered despite their active participation on social media. For example, the United States Department of Agriculture's Food and Nutrition Service actively uses Twitter (@USDANutrition) to promote healthy food options and opportunities for nutrition education but has not registered its account with the U.S.D.S.

Federal agencies frequently used and continue to use social media to promote U.S. policy interests. The Obama Administration's Department of Health and Human Services' social media feeds advocated for passage of the Affordable Care Act. After passage, it continued to educate the public on enrollment periods and new protections for healthcare, with digital advertisements driving at least 4 million users to sign up with HealthCare.gov in the first year.

h. Similarly, the U.S. Department of State's Twitter page, @StateDept, routinely posts statements, photographs, and links regarding official visits with foreign dignitaries and the U.S. position on world events. Members of Congress are also actively engaged in social media as a method of conversing with their constituents and connecting with their communities. All 100 Senators and the overwhelming majority of Representatives use social media. Congressional Research Service, Social Media in Congress: The Impact of Electronic Media on Member Communications, R44509, (May 26, 2016).8 In a survey of members of Congress and their staff, the Congressional Management Foundation found that 76% of respondents felt that social media enabled more meaningful interactions with constituents; 70% found that social media made them more accountable to their constituents; and 71% said that constituent comments directed to the representative on social media would influence an undecided lawmaker. Congressional Management Foundation, #SocialCongress2015, (2015).

i. After large policy announcements from the executive branch, Members of Congress often disseminate their opinions via social media. When former Secretary of State John Kerry gave a speech supporting military action in Syria, members of Congress took to Twitter and even used the platform to advance public petitions to prevent military action.

j. The use of social media as an efficient method of communication between governmental offices and the public is perhaps best seen with state and local governments. Local police departments, councilpersons, mayors, and state legislatures use their Facebook, Twitter, and other social media feeds as real-time bulletin boards for important community information. The crucial public benefits of social media use by local governments was made starkly obvious during the recent natural disasters. These uses highlight the real dangers of denying individuals access to the information disseminated by their government via social media. Consider the multiple hurricanes that made landfall in the United States in 2017. The Mayor of San Juan Puerto Rico used her Twitter feed, @CarmenYulinCruz, to direct the city towards emergency resources in the wake of Hurricane Maria and alert residents on the status of the slow and ongoing recovery. Similarly, the Mayor of Houston, @SylvesterTurner, and the Mayor of Dallas, @Mike_Rawlings, provided their residents with the latest information on Hurricane Harvey relief through Twitter and other social media pages. And the governor of Florida, @FLGovScott, tweeted in both English and Spanish to alert citizens on evacuation from Hurricane Irma, emergency recovery spending in the state legislature, and state bills to offer support to Puerto Rico in the devastating aftermath of their own hurricane.

k. During the recent firestorms in California, residents in Sonoma and Napa counties could rely on local officials and agencies using social media to transmit important information, including evacuation orders and resources about fire containment, emergency contact information, medical services, and food bank need.

l. Crucially, these feeds are viewed as authoritative and reliable in times of public safety and civic confusion. After Hurricane Harvey, Mayor Turner published a Facebook post to dispel rumors that citizenship documentation

1    was needed to receive disaster aid. This post, translated into six languages, was

2    designed to ensure the people of Houston received accurate information.

3           m. Local police departments also update the public through social media

4    about ongoing investigations, and, in many cases, individual access to these

5    feeds is necessary for residents and other people in the area to timely assess

6    public safety. The Boston Police Department updated the city in the aftermath

7    of the 2013 Boston Marathon bombing, including telling residents to shelter in

8    place and then alerting when the bombing suspect was captured.

9           n. Similarly, the Las Vegas Police Department used Twitter to give the

10   community real- time updates after the October 2017 mass-shooting at a

11   country music festival, including disclosing to the public that there was only

12   one shooter.

13          o. Public officials commonly use nominally "personal" social media

14   profiles for these official communications. For example, when John Kerry

15   became Secretary of State in 2013, he inherited and used the handle

16   @StateDept. But one year later he began promoting U.S. diplomatic policy

17   through the handle @JohnKerry as his official twitter feed. The @POTUS

18   handle was not created until 2015. Before then, Former President Barrack

19   Obama used his named account @BarackObama for campaign materials and

20   would sign messages from the @WhiteHouse handle with "bo" to indicate his

21   authorship. When President-elect Trump decided, as he told British press in

22   January 2017, that he intended to keep his named Twitter handle,

23   @realDonaldTrump, because it garnered more followers than the @POTUS

24   handle at the time, he was in no way outside the norm. Heads of government

25   institutions and political leaders will on average have more followers on their

26   individual accounts than on their official or institutional ones. Mickoleit, A.,

27   "Social Media Use by Governments: A Policy Primer to Discuss Trends,

28   Identify Policy Opportunities and Guide Decision Makers," OECD Working

1  Papers on Public Governance, No. 26, OECD Publishing, Paris (2014).

2  Additionally, researchers studying the psychology of online news have found

3  that social media users and news readers do not typically distinguish between

4  institutional and personal accounts when accessing news stories; therefore, it is

5  unlikely that the average Twitter user in the United States distinguishes

6  between President Donald Trump's use of @realDonaldTrump and his use of

7  @POTUS when accessing the accounts or reading about them.

8       p. In analogous contexts, courts have found officials to be conducting

9  governmental business despite their use of personal accounts on private third-

10  party communications services. For example, courts interpreting public

11  records laws have found that emails sent from and received by the private

12  email accounts of governmental officials to be public records. In so doing,

13  these courts have focused on the function of the email accounts as, at least in

14  part, a platform for conducting public business rather than a private account or

15  a privately-run service.

16       q. The D.C. Circuit recently ordered the disclosure of emails containing

17  government business sent to and from the personal email account of John

18  Holdren, the former head of the Office of Science and Technology Policy,

19  finding that the use of a private domain does not subvert citizens' right to

20  know what the department is up to. Competitive Enterprise Institute v. Office

21  of Science & Technology Policy, 827 F.3d 145, 150 (D.C. Cir. 2016).

22       r. States courts interpreting state records laws are ruling similarly, with

23  the Supreme Court of California most recently determining the accessibility of

24  public records on private email. See City of San Jose v. Superior Court of

25  Santa Clara, 2 Cal 5th 608, 629 (2017); Griffis v. Pinal Cty., 156 P.3d 418, 421

26  (2007); Bradford v. Director, Employment Security Department, 128

27  S.W.3d 20 (2003); Res Reporter Co., Inc. v. Columbus County, S.E.2d 390,

28  393 (2007); Burton v. Mann, No. 47488, 2008 WL 8779064 at *3(Va. Cir Jan.

30 2008); O'Neill v. Shoreline, 240 P.3d 1149 (2010). State Attorneys General have agreed. MD 81 Op. Att'y Gen. 140 (1996); N.D. Op. Att'y Gen. 2008-O-15 (2008); OK AG 12 (2009); Tex. Att'y Gen. ORD-1790 (2001).

II. MEMBERS OF THE PUBLIC HAVE A FIRST AMENDMENT RIGHT OF ACCESS TO THE SOCIAL MEDIA FEEDS OF GOVERNMENTAL OFFICIALS AND AGENCIES; THIS RIGHT IS INFRINGED WHEN THEY ARE BLOCKED BECAUSE THE OFFICIAL DISLIKES THEIR VIEWPOINT.

s. Given that agencies and officials use social media to convey important public safety information, denying individuals access to those feeds because of a disapproval of their viewpoints [is a violation of their First Amendment Rights.]

t. The Reporters Committee for Freedom of the Press is tracking the issue as it arises in state courts throughout the country through their online comparative Open Government Guide, as it endangers lives. And denying disfavored citizens access to policy announcements and debates among legislators hinders their ability to monitor the performance of their governmental officials and otherwise participate in their own governance.

u. Such discriminatory denial of access also violates the First Amendment. When governmental events and communications are generally open to the public, viewpoint-based exclusion of some individuals is unconstitutional.

v. This requirement of equal access was the law before the advent of social media, when governmental officials and agencies communicated to the public through the press, playing its "surrogate" role. See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 573 (1980) (explaining surrogate role the press plays in channeling information from the government to the public). Discrimination against a newspaper was in effect discriminating

1   against that newspaper's readers. The law should be no different now that

2   officials and agencies can communicate directly with the public rather than

3   through news media intermediaries: "The First Amendment guarantees a

4   limited right of access to news regarding activities and operations of

5   government. This right includes, at a minimum, a right of access to

6   information made available to the public or made available generally to the

7   press." Times-Picayune Pub. Corp. v. Lee, 15 Media L. Rep. 1713, 1988 WL

8   36491, at *9 (E.D. La. 1988) (emphasis added) (nullifying a sheriff's direction

9   that his officers not process a newspaper's public records requests, nor notify it

10  of or allow its reporters to attend press conferences, nor notify it of significant

11  events, such as shootings and traffic fatalities).

12         w. The Second Circuit thus held that the First Amendment rights of ABC

13  News "and its viewing public" would "be impaired by the exclusion" of ABC

14  from election night campaign rallies that were otherwise open to the news

15  media. American Broadcasting Companies, Inc. v. Cuomo, 570 F.2d 1080 (2d

16  Cir. 1977). "[O]nce there is a public function, public comment, and

17  participation by some of the media, the First Amendment requires equal access

18  to all of the media or the rights of the First Amendment would no longer be

19  tenable." Id. The Second Circuit specifically rejected the argument that the

20  right of access involved was "necessarily the outer limit of the constitutional

21  protection of the First Amendment." Likewise, in Stevens v. New York Racing

22  Ass'n, Inc., 665 F. Supp. 164, 175 (E.D.N.Y. 1987), the court ruled that a

23  photojournalist could not be barred from bringing his camera into the racetrack

24  paddock areas that were otherwise open to all other journalists because the

25  event sponsor disapproved of the way the photojournalist covered the event.

26  Such content-based restrictions on access were prohibited. But because of the

27  important First Amendment rights involved, even content-neutral access

28  restrictions would be unconstitutional unless the plaintiff could demonstrate

1   that "the restriction does not serve a legitimate government objective or that

2   the benefits derived from the restriction are fewer than the harm it causes."

3        x. This equal access rule has wide acceptance in courts around the

4   country in a wide variety of contexts. The rule was applied to enjoin the

5   exclusion of a teacher's union newspaper from the School Board press room in

6   Florida, United Teachers of Dade v. Stierheim, 213 F. Supp. 2d 1368, 1372-73

7   (S.D. Fla. 2002), and the exclusion from city council meetings in Boston of

8   TV stations being operated by management during a labor strike.

9   Westinghouse Broadcasting Co. v. Dukakis, 409 F. Supp. 895 (D. Mass. 1976).

10   It was applied to ensure that an underground newspaper in Iowa had access to

11   police records, Quad–City Community News Service, Inc. v.

12   Jebens, 334 F. Supp. 8, 13 (S.D. Iowa 1971) (explaining that the information

13   "has already been made available to the public insofar as other media's

14   reporters are the public's representatives"),

15   and to guarantee that all media outlets had access to discovery materials the

16   judge had shared with one media outlet. Anderson v. Cryovac, 805 F.2d 1, 10

17   (1st Cir. 1986). And it was applied against the Mayor of Honolulu who had

18   excluded a reporter, whom the mayor found was "irresponsible, inaccurate,

19   biased, and malicious" in his reporting, from an otherwise open press

20   conference. Borreca v. Fasi, 369 F. Supp. 906, 910 (D. Hawaii 1974).

21        y. The exclusion of individuals because of government disapproval of

22   their viewpoints raises special concerns that officials could manipulate the

23   public's perception of them by disseminating their messages only through

24   favorable filters. "Hand-picking those in attendance," the Borreca court

25   observed, "intensifies the manipulation."

26        z. That the public, in these cases through the press, could ultimately get

27   the information from other, less direct channels does not cure the constitutional

28   defect. In Southwestern Newspapers v. Curtis, 584 S.W. 2d 362, 363, 369

1   (Tex. Civ. App. 1979), the court enjoined a district attorney from requiring that

2   reporters from a certain newspaper make appointments to gain access to

3   official news sources, while he made them available without appointments to

4   all other media. As the court in Westinghouse, 409 F. Supp. at 896, found,

5   access must be provided with "equal convenience." See also Stierheim, 213 F.

6   Supp. 2d at 1374 (finding First Amendment violation where reporters were

7   "nevertheless deprived of the newsgathering environment and opportunities"

8   afforded to the other news media). Nor does it matter that the government

9   shares the access decisions with a private actor. In Telemundo of Los Angeles

10   v. City of Los Angeles, 283 F. Supp. 2d 1095, 1103 (C.D. Cal. 2003), the Court

11   found that a TV station had a First Amendment right to cover the city's official

12   El Grito ceremony because the city and its nongovernmental co-presenters

13   permitted another broadcaster to do so. That the city shared, and in some

14   situations yielded, decision-making authority with a private civic organization

15   and another broadcaster, did not diminish the city's obligation to provide equal

16   access. See also Southeastern Promotions Ltd. v. Conrad, 420 U.S. 546 (1975)

17   (applying public forum doctrine to privately owned theater leased to the city).

18       aa. The First Amendment thus protects access to governmental

19   communications, ensuring that individuals are not denied speech alerting them

20   in times of crisis, distributing necessary information about government

21   services, and providing transparency about elected and appointed officials'

22   actions and statements.

23       III. MEMBERS OF THE PUBLIC HAVE A FIRST AMENDMENT

24   RIGHT TO COMMUNICATE WITH GOVERNMENTAL OFFICIALS

25   THROUGH SOCIAL MEDIA WHEN SUCH CHANNELS ARE

26   GENERALLY OPEN TO THE PUBLIC; THIS RIGHT IS INFRINGED

27   WHEN THEY ARE BLOCKED BECAUSE THE OFFICIAL DISLIKES

28   THEIR VIEWPOINT.

1       ab. Certain social media platforms in widespread use by governmental

2   agencies and officials allow them not only to communicate to the public, but

3   allow the public to communicate back to the agency and with each other, thus

4   creating forums for private speech. In so doing, the government endows the

5   public with First Amendment rights to speak in these forums. Just what kind of

6   forum is created will depend on how the official specifically operates it. But

7   viewpoint discrimination resulting in the targeted expulsion of individual

8   citizens and residents from these forums is barred regardless of whether it is a

9   public, limited or designated, or non-public forum. Perry Education Ass'n v.

10  Perry Local Educators's Ass'n, 460 U.S. 37, 46 (1982) (holding that even in a

11  non-public forum, a speaker may not be excluded as "an effort to suppress

12  expression merely because public officials oppose the speaker's views").

13  ac. The social media platforms federal, state, and local governments

14  commonly use – such as Twitter, Facebook, Instagram – create such forums.

15  And government officials and agencies commonly use them for these

16  democratizing purposes. As the Supreme Court recently recognized, "[O]n

17  Twitter, users can petition their elected representatives and otherwise engage

18  with them in a direct manner. Indeed, Governors in all 50 states and almost

19  every Member of Congress have set up accounts for this purpose."

20  Packingham v. North Carolina, U.S. 137 S. Ct. 1730, 1735, (2017). Thus, in

21  Davison v. Plowman, 2017 WL 105984, *3-*4 (E.D. Va.,

22  Jan. 10, 2017), the court found that the comment section to the Commonwealth

23  Attorney's Facebook page to be a limited public forum since the County

24  "'encourage[s]' commenters 'to engage [their local government through social

25  media by submitting . . . comments and questions regarding posted topics.'"

26  These forums are by their nature, and often by default, open to large segments

27  of the population – potentially every person with access to the Internet around

28  the world – and are not constrained by size, capacity, and even time, like

physical spaces.

ad. The U.S. federal government has operated social media profiles in this way for some time. The U.S. Department of Education, for example, routinely holds monthly "office hours" where parents and students can ask about the federal student loan process on Twitter using the tag #AskFAFSA. Department of Education uses the Twitter handle @FAFSA to reply directly to individuals' questions and then compiles monthly questions and responses on a separate site for increased visibility.

ae. The compiled Twitter questions and answers through the tag #AskFAFSA can be found for each month at https://storify.com/FAFSA/. Similarly, the Transportation and Security Administration maintains a Twitter feed where individuals, regardless of their nationality, can submit questions about safety regulations for flying to, from, and within the United States by tweeting to the handle @AskTSA.

af. At the local level, representatives and councilmembers open their social media profiles to their constituents by holding online versions of town halls, even promoting hashtags (searchable links) where constituents can submit their opinions and advocate for changes to improve their communities. In 2015, the mayor of Boston, @Marty_Walsh, announced a call for collaboration on both social media and in the press to revamp Boston's City Hall and the surrounding plaza. Residents took to Twitter using the tag #CityHallPlaza to submit recommendations for the space, upload pictures as a part of the campaign, and even submit their detailed proposals for the space so that other engaged citizens could learn more.

ag. In Cleveland, Mayor Frank Jackson, holds "Twitter town halls" where residents can tweet questions to him and he responds via live video. The benefits of a direct engagement forum to both government and the public are readily apparent in the emergency services context.

1   During Hurricane Harvey, the Mayor of Houston was able to converse with his
2   constituents on Facebook to deliver important information, dispel rumors in
3   order to limit confusion during the crisis, and in one case ensure that
4   emergency medical services could attend to a baby whose breathing machine
5   would soon lose power.

6   ah. This single interaction demonstrates that even though government
7   social media serves a widespread audience, the capabilities for tailored and
8   direct response are remarkable. On a single tweet from President Trump,
9   citizens can respond directly to the President and comment on his policy
10   announcements, other lawmakers can respond to the President and comment
11   on the policy, and citizens can then respond to those lawmakers' responses. For
12   example, President Trump's suggestion that New York Senator Chuck
13   Schumer bore some policy responsibility for the October 31, 2017 terrorist
14   attack in New York City started a multi-level debate on immigration policy
15   that included other U.S. senators and citizens from different sides of the
16   political spectrum.

17   ai. After Representative Ted Lieu, @tedlieu, tweeted his letter calling for
18   a congressional hearing on U.S. military deployment in Niger, individuals both
19   supporting and opposing his position, responded with comments offering
20   suggestions on the direction and focus of such a hearing. It is clear then that in
21   practice, social media platforms like Twitter that allow for the general public
22   to comment upon governmental posts, or communicate directly with officials,
23   agencies, or to otherwise participate in a publicly viewable debate, function
24   like the paradigmatic speakers' corner in a public park. [See Perry, 460 U.S. at
25   45 (identifying streets and parks as"quintessential public forums" for
26   "assembly, communicating thoughts between citizens, and discussing public
27   questions").] Indeed, governmental social media accounts probably host these
28   functions more than parks and streets currently do.

1    As the Supreme Court recognized just last term, "While in the past there may

2    have been difficulty in identifying the most important places (in a spatial

3    sense) for the exchange of views, today the answer is clear. It is cyberspace—

4    the 'vast democratic forums of the Internet' in general, Reno v. American Civil

5    Liberties Union, 521 U.S. 844, 868 (1977), and social media in particular."

6    Packingham, 137 S. Ct. at 1735 (included citation abbreviated) (explaining

7    that a denial of access to social media was a significant abridgement of First

8    Amendment rights given modern civic and social communication).

9    Viewpoint discrimination in such forums plainly violates the First

10   Amendment.

CONCLUSION

12        aj. The President's blocking of private Twitter users based on their

13   disfavorable view of him is unconstitutional. Social media use by governments

14   around the world, on every level of government is the rule now, not the

15   exception. And while social media currently supplements other methods of

16   communication to and with the public, one could credibly predict that it will

17   shortly become the predominant form of communication. As a result, members

18   of the public must have a cognizable First Amendment right to receive such

19   otherwise public communications from the government, and to participate in

20   the forums that are created. The First Amendment prohibits viewpoint

21   discrimination in all analogous, pre-digital situations. It must do so here as

22   well."

23        167. The EFF's view, seen above, can likewise be interpreted as factual

24   indirect/direct support for Twitter as public forum from the Electronic Frontier

25   Foundation in both official and legal capacities.

G. Twitter as Public Forum by extension

168. On March 5, 2007, future President and then-US Senator (D-IL) the Barack Obama joined Twitter. He quickly became one of the most followed users on the platform. On August 15, 2008, Senator Obama became the most followed user on Twitter, with 58,000 followers. From that point on, the majority of new Twitter users joined to follow Senator, Candidate and future President Barack Obama, who tweeted primarily in an official capacity via his campaign staff and assistants, using public money in the form of both campaign contributions and tax dollars. Many journalists and news outlets cited Barack Obama's use of social media as critical to both of his Presidential election victories.

169. Barack Obama's subsequent Presidential victory over the then-relatively-absent from social media Senator John McCain of Arizona, who had less than 1,000 followers in August 2008 and "doesn't use email" was directly tied to Twitter's subsequent massive influx of growth and revenue. Had John McCain defeated Barack Obama, it is almost certain that Twitter would have disappeared or been largely vacated by 2009, as previous social networks had (MySpace, Friendster).

170. Beginning in June 2009 and carrying through to May 2010, Twitter's servers were overloaded due to an influx of user growth as well as many offshore direct-denial-of-service (DDoS) and other 'hacker' attacks on their servers. President Barack Obama provided both official public support in his official capacity and private support as a citizen in order to alleviate the downtime experienced by Twitter.

172. The material support of the President of the United States of America was a key factor in venture capital raises for Twitter – in 2009 Twitter's biggest pre-Obama-assistance raise was $35 million, and their valuation was less than $1 billion. Many in the company, including Jack Dorsey and ex-CEO Dick Costolo had considered "shutting it down" due to

1   expenses, which exceeded their revenues of only $400,000/year. After

2   President Obama's intervention in/with Twitter and the popular success of the

3   "Town Hall" events which he participated in as the 44th President of the United

4   States, Twitter was able to raise $200 million in December 2010 and their

5   valuation skyrocketed to $3.7 billion, followed by a raise of $800 million in

6   March 2011, and another $300 million in December 2011, with a valuation of

7   $8.4 billion. The involvement of the US Federal Government made Twitter

8   "too big to fail".

9       173. Without (that) direct support from the President of the United

10   States and the United States Federal Government, Twitter would have been

11   unable to continue and maintain its day-to-day operations, and thus a

12   permanent relationship/contract between the US Federal Government and

13   Twitter was formed. Barack Obama (@barackobama, approx. 103 million

14   followers) was the most followed user on Twitter between 2008 and 2018,

15   until being recently dethroned by singers Justin Bieber (@justinbieber, approx.

16   106 million followers) and Katy Perry (@katyperry, approx. 110 million

17   followers).

18       174. 44th President of the United States, Barack Obama, in his official

19   capacity, conducted multiple "Town Halls" where taxpayer money was

20   materially used to benefit both his office and personal status, as well as Twitter

21   as a platform, including the 2009 and 2011 Town Halls which were two of the

22   most followed/engaged/viewed events in Twitter history, as well as two of the

23   most participated-in events in the history of the internet itself.

24       175. On June 17, 2009, the Obama Administration made a formal

25   request to Twitter to remain in operations in order to "keep Iran tweeting",

26   instead of shutting down as planned, thus extending the entire platform to

27   'public forum' status via the will and intent of the US Federal Government.

28

176. Thereby logically, via use of taxpayer funds as well as the office in its official capacity, in light of the recent findings of Knight First Amendment Center v. Trump, it can be concluded that Twitter, which would have been unsustainable and unprofitable without President Barack Obama's substantial use of and contributions to the website and company, is entirely a public forum, as taxpayers have paid for it and/or invested in its existence with tax monies and participatory actions resulting in advertising revenue between 2008-present, where tax dollars effectively or literally were used to maintain and operate Twitter's tools and services, and thus Defendant Twitter has no right to deny taxpayers access to a public forum which they have funded/invested in/paid for on a semi-regular basis, without a vote or representation.

FIRST CAUSE OF ACTION

Violation of the First Amendment of the US Constitution

(Declaratory and Injunctive Relief)

177. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though set forth fully herein.

178. Defendant's blocking, suspending, shadowbanning, limiting, and/or unverifying of the Accounts of Plaintiffs and Others from the @realDonaldTrump account as well as the ability to follow and interact with other public figures/officials/candidates violates the First Amendment because it imposes a viewpoint-based restriction on Plaintiffs and Others' participation in a public forum.

179. Defendant's blocking, suspending, shadowbanning, limiting, and/or unverifying of the Accounts of Plaintiffs and Others from the @realDonaldTrump account as well as the ability to follow and interact with

1  other public figures/officials/candidates violates the First Amendment  because

2  it imposes a viewpoint-based restriction on the Plaintiffs and Others' access to

3  official statements the President and other public figures/officials/candidates

4  otherwise make(s) available to the general public.

5         180. Defendant's blocking, suspending, shadowbanning, limiting, and/or

6  unverifying of the Accounts of Plaintiffs and Others from the

7  @realDonaldTrump account as well as the ability to follow and interact with

8  other public figures/officials/candidates violates the First Amendment because

9  it imposes a viewpoint-based restriction on Plaintiffs and Others' ability to

10 petition the government for redress of grievances.

11        181. Defendant's blocking, suspending, shadowbanning, limiting, and/or

12 unverifying of the Accounts of Plaintiffs and Others from the

13 @realDonaldTrump account as well as the ability to follow and interact with

14 other public figures/officials/candidates violates the First Amendment because

15 it imposes a viewpoint-based restriction on Plaintiffs and Others right to hear.

16        182. Defendant's blocking, suspending, shadowbanning, limiting, and/or

17 unverifying of the Accounts of the Plaintiffs in particular as candidates for

18 public office as well as the ability to follow and interact with other public

19 figures/officials/candidates infringes and violates their First Amendment

20 ability to create a public forum for their followers as well, as candidates for

21 public office have the same weight in creating public forums as elected

22 officials, and their speech should be likewise equally upheld under the First

23 Amendment.

24        183. The dangers that would result from Twitter being able to hold itself

25 out as a public forum for individuals to communicate in "Town Hall" forums

26 with their elected representatives (and other similar public forum

27 communications), on one hand, while allowing Twitter to ban users from

28 participating on its forum if it disagrees with their viewpoints, on the other, are

1   self-evident. Individuals could be deprived of their most essential free-speech

2   rights based on internal Twitter corporate directives.

3

4   SECOND CAUSE OF ACTION

5   Violation of Federal Election rules, (47 U.S. Code § 315)

6   (Declaratory and Injunctive Relief)

7

8       184. Plaintiffs re-allege and incorporate by reference each and every

9   preceding paragraph as though set forth fully herein.

10      185. Defendant's blocking/suspension/shadowbanning/unverifying of

11  US Senate Candidate Craig R. Brittain and his principal campaign committee,

12  Brittain for US Senate, while promoting and verifying other campaigns such as

13  the campaigns of Kyrsten Sinema, Kelli Ward, Joe Arpaio, Martha McSally

14  and Deedra Abboud, constitutes a direct violation of 47 U.S. Code § 315,

15  which states clearly:

16      186. "If any licensee shall permit any person who is a legally qualified

17  candidate for any public office to use a broadcasting station, he shall afford

18  equal opportunities to all other such candidates for that office in the use of

19  such broadcasting station: Provided, That such licensee shall have no power of

20  censorship over the material broadcast under the provisions of this section. No

21  obligation is imposed under this subsection upon any licensee to allow the use

22  of its station by any such candidate."

23      187. As Defendant relies on the use of Periscope on its platform to

24  conduct broadcasts, and numerous candidates have direct access to Periscope

25  and other methods of direct broadcasting via Twitter, it can logically be

26  concluded that Twitter is and/or provides access to a "broadcasting station" for

27  the intents and purposes expressed here, provided that President Trump's

28  Twitter account is upheld as a public forum, logically his Twitter account itself

1   has "broadcast access" as both @realDonaldTrump and @POTUS have

2   streamed direct live broadcast content from their tweets.

3        188. Defendant also streams live video content from cable broadcast

4   stations to include, but not limited to MSNBC, CNN, Fox News, Univision,

5   and many more, who also have accounts on Twitter which enable them to

6   communicate with their viewers during the broadcasts. This furthers the claim

7   that Twitter itself is, in part or whole, a "broadcasting station" for the purposes

8   of 47 U.S. Code § 315, as it is a key part of television networks' increasing and

9   maintaining their viewership.

10

11   THIRD CAUSE OF ACTION

12   Breach of Contract

13   (Declaratory and Injunctive Relief)

14

15        189. Plaintiffs re-allege and incorporate by reference each and every

16   preceding paragraph as though set forth fully herein.

17        190. The Twitter Terms of Service and Twitter Rules form a binding

18   written contract between Twitter and Plaintiffs and Others, governing their use

19   of Twitter. Implied in those contracts is the implied covenant of good faith and

20   fair dealing. This is particularly so because these contracts were presented to

21   Plaintiffs and Others on a take-it-or-leave-it basis, without any opportunity for

22   meaningful bargaining or negotiation. To the extent these contracts delegate

23   broad discretionary power to Twitter, Twitter is obligated to exercise those

24   powers fairly and in good faith. However, Defendant Twitter was the first to

25   breach the contract by their own admission. Horton v. Horton, 254, Va.

26   111/115 (1997), states: "Generally, a party who commits the first breach of a

27   contract is not entitled to enforce the contract." "Specifically, if the initial

28   breach is material, the other party to the contract is excused from performing

1    [their] contractual obligations." "A material breach is a failure to do

2    something that is so fundamental to the contract that the failure to perform the

3    obligation defeats an essential purpose of the contract." In the case of Twitter,

4    it has committed millions of material breaches prior to the commission of a

5    single breach of its Terms of Service by any user.

6          191. Plaintiffs and Others added all existing value to the Accounts,

7    which have no default value, and Defendant was the first to breach the

8    contract, converting that value. As explained in Haslem v. Lockwood (1871):

9    "But it is said that if the manure was personal property, it was in the

10   possession of the owner of the fee, and the scraping it into heaps by the

11   plaintiff did not change the possession, but it continued as before, and that

12   therefore the plaintiff cannot recover, for he neither had the possession nor the

13   right to the immediate possession. The manure originally belonged to the

14   travelers whose animals dropped it, but it being worthless to them was

15   immediately abandoned; and whether it then became the property of the

16   borough of Stamford which owned the fee of the land on which the manure

17   lay, it is unnecessary to determine; for, if it did, the case finds that the removal

18   of the filth would be an improvement to the borough, and no objection was

19   made by any one to the use that the plaintiff attempted to make of it.

20   Considering the character of such accumulations upon highways in cities and

21   villages, and the light in which they are everywhere regarded in closely settled

22   communities, we cannot believe that the borough in this instance would have

23   had any objection to the act of the plaintiff in removing a nuisance that

24   affected the public health and the appearance of the streets. At all events, we

25   think the facts of the case show a sufficient right in the plaintiff to the

26   immediate possession of the property as against a mere wrong doer."

27

28

1   Thus, Twitter accounts without their owners/authors are useless as manure
2   without farmers. Twitter's attempts to seize the Accounts likewise mirror the
3   events of Haslem v.Lockwood, in which the Defendant unlawfully took the
4   Plaintiff's manure.

5        192. At all times, Plaintiffs and Others substantially complied with all of
6   Twitter's Rules and Terms of Service, none of their tweets violated the letter or
7   spirit of any term in Twitter's Terms of Service  or Twitter Rules, and never
8   engaged in harassment or abuse of other users, nor promoted violence against
9   any individual or group, or used hateful imagery.

10        193. Defendant was bound by the implied covenant of good faith and
11   fair dealing in its agreements, terms, and policies, not to engage in any acts,
12   conduct, or omissions that would impair or diminish Plaintiffs and Others'
13   rights and benefits under the parties' agreements, and pursuant to the terms of
14   those agreements, they were supposed to have equal access to Twitter's
15   platform so long as they complied with Twitter's Rules and Terms of Service.
16   Twitter has, by the acts and omissions complained of herein, intentionally and
17   tortiously breached the implied covenant of good faith and fair dealing by
18   unfairly interfering with Plaintiffs and Others rights to receive the benefits of
19   their contracts with Twitter.

20        194. Defendant engaged in the foregoing acts and omissions by Twitter
21   with the knowledge that it was bound to act consistently with the covenant of
22   good faith and fair dealing. Those acts and omissions were not only failures to
23   act fairly and in good faith, but they were acts of oppression, fraud, and
24   malice. As a direct and proximate result of Twitter's breach of contract,
25   Plaintiffs have suffered, and will continue to suffer, immediate and irreparable
26   injury in fact, including lost income, reduced donor and subscriber base, and
27   damage to brand, reputation, and goodwill, for which there exists no adequate
28   remedy at law.

FOURTH CAUSE OF ACTION

Conversion

(Declaratory and Injunctive Relief)

195. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though set forth fully herein.

196. Plaintiffs emphasize in this instance and restate the Third Cause of Action, Breach of Contract, as the Conversion claim is inextricable from the Breach of Contract claim.

197. Plaintiffs had ownership over and the right to possess the Accounts, which they developed and cultivated at great cost, effort and expense. Over the course of over 5 years, Plaintiffs invested countless hours and significant time and effort into cultivating a large follower base and Twitter presence for the Accounts.

198. Defendant maintains an internal valuation of followers on its platform at $2.50-$3.50 per follower. At all times, Twitter recognized that followers on its platform are assets with independent economic value. It also recognizes that accounts are assets owned solely by their owners, which account owners may sell or assign to others. In truth, the valuation, particularly of followers of a verified account and especially celebrity followers, is much higher than $2.50-$3.50 as celebrity followings cannot be purchased nor valued. 1,700 celebrity followings each have immeasurable value that cannot be equated/computed by simple math.

199. The verified @CraigRBrittain account had over 150,000 followers at the time of its suspension on February 1, 2017. The @AuditTheMedia account had 106,000 followers at the time of its suspension on February 2, 2017. The @SenatorBrittain (Brittain for US Senate) account had 118,000 followers at the time of its suspension on March 30, 2018. The accounts of Brittain's staff members totaled over 32,000 combined followers at the time of

their suspensions on May 23, 2018.

200. Defendant converted the Accounts by permanently banning Plaintiffs from having access to them and by refusing to restore access after Plaintiffs demanded that they be reinstated. Twitter's interference with Plaintiffs' right to possess the accounts was unwarranted, without justification, and has deprived Plaintiffs of their property rights in the Accounts. As a result of Twitter's tortious acts in preventing Plaintiffs from accessing the Accounts, they have suffered, and will continue to suffer, immediate and irreparable injury in fact, including lost income, reduced donor and subscriber base, and damage to brand, reputation, and goodwill, for which there exists no adequate remedy at law (A Crippling Blow).

FIFTH CAUSE OF ACTION

Violation of Antitrust Laws

(Declarative and Injunctive Relief)

201. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though set forth fully herein.

202. 15 U.S. Code § 2 (Part of the Sherman Antitrust Act) states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."

To meet the guidelines for a Section 2 violation, Twitter must be:

a. In possession of monopoly power in a given market.

b. Willfully acquiring/maintaining that power as distinguished from growth as a consequence of a superior product, business acumen, or historic accident. Twitter could also be violating Section 2 via:

c. Qualifying exclusionary or anticompetitive acts designed to establish a monopoly.

d.  Specific intent to monopolize; and

e. Dangerous probability of success.

There are currently only 3 major players in US social networking:

f. Facebook, which also owns Instagram, and controls over 33% of the US social network market.

g. YouTube, owned by Google, which controls over 33% of the US social network market.

h. Twitter, which also owns Periscope, and controls about 25% of the US social network market.

i. All others including Tumblr and Pinterest control less than 10% of the US social network market.

Therefore, it can logically be concluded that Defendant is in possession of monopoly power.

203. As the Court concluded in United States v. American Telephone & Telegraph Co., 461 F. Supp. 1314 (D.D.C. 1978) and in United States v. American Tel. and Tel. Co., 552 F. Supp. 131 (D.D.C. 1983), digital providers are not guaranteed exemptions or exceptions from antitrust laws. Evidence of anticompetitive actions must exist to qualify for Section 2, which exists for Twitter in the form of the regulation of Third Party services and APIs, and the filtering/downranking of competing social networks and their websites, such as filtering/downranking/shadowbanning Tweets which promote YouTube videos, Facebook links, etc. to discourage engagement. APIs which helped users fully control the engagement of their followers were limited and

1   suspended in order to reinforce the digital monopoly held by Twitter.
2   The lack of ability to 'export' followers to another service/social network,
3   including one personally owned by a(ny) individual Twitter user, along with
4   Twitter's interference in any attempt to export followers/social links or create a
5   service which does this (as they famously blocked Yahoo, Facebook and
6   MSN's attempts to use their API to interface between the services, along with
7   the attempts of other smaller third parties), constitutes anticompetitive activity.

8       204. The remedy for antitrust must not cripple the company in question,
9   but must also provide relief for those affected by anticompetitive practices.
10  Therefore, logically, independent ownership and operation of Twitter accounts
11  by individual users, hosted on their own compatible websites/platforms is an
12  acceptable solution, allowing them to keep all of the followers they have
13  earned without relying on Twitter for a platform, meaning that Twitter will not
14  display advertising to them but rather the individual user can decide if/what to
15  advertise at their discretion, enabling the users to compete via the primary
16  means of Twitter's business, advertising, or other means of monetization as the
17  user sees fit. This would constitute "reorganization" with regards to United
18  States v. American Tel. and Tel. Co., 552 F. Supp. 131 (D.D.C. 1983), where
19  the user is the primary owner/operator of their own Twitter feed/timeline,
20  rather than Twitter itself.

21      205. Defendant is not in possession of a superior product, as the product
22  has not changed significantly since the founding of the company. CEO Jack
23  Dorsey has been regularly criticized for his lack of business acumen, with
24  many users and shareholders demanding his firing. Several lawsuits have also
25  been filed against Twitter alleging the exaggerations of Jack Dorsey and other
26  executives regarding the profitability/growth of Twitter. It would be inaccurate
27  to assume that Twitter is the result of some sort of historic accident, as no
28  evidence suggests that.

206. Therefore, it can logically be concluded that Defendant is in violation of 15 U.S. Code § 2, and subsequently that user blocking/suspending/shadowbanning/limiting/unverifying likewise constitute abuses of monopoly power, along with interference with access to public forums, and declaratory and injunctive relief is due on the largest scale imaginable. Whether or not the Court has jurisdiction to execute injunctive antitrust action, a declaration that it is needed should be rendered by this Court, and the correct Court with jurisdiction should schedule Twitter for reorganization stated above.

SIXTH CAUSE OF ACTION

Violation of the Telecommunications Act of 1996 (47 U.S. Code § 230)

(Declaratory Relief)

207. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though set forth fully herein.

208. Defendant's protections under 47 U.S. Code § 230 stem from its classification as an interactive computer service. However, the presence of @Policy and unequal treatment for its users, as well as the promotion of content it agrees with ("Moments" "Front Page") and the "downranking" of content which it disagrees with (to include suspensions and shadowbanning) indicate(s) that Twitter is actually an information content provider. Thereby, Twitter should be declared liable for content which appears on its platform, until at which point it ceases to act as an information content provider, and acts solely as an interactive computer service.

SEVENTH CAUSE OF ACTION

Negligent Infliction of Emotional Injury/Distress

(Declarative and Injunctive Relief)

209. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though set forth fully herein.

210. Defendant's suspension(s) of the Plaintiffs' accounts did cause substantial mental/emotional distress due to the loss of accounts which took years to build, support and cultivate. The court in Dillon v. Legg, 68 Cal. 2D 728 (1968) ruled: "the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk, that factor will be of prime concern in every case. Because it is inherently intertwined with foreseeability such duty or obligation must necessarily be adjudicated only upon a case-by-case basis. We cannot now predetermine defendant's obligation in every situation by a fixed category; no immutable rule can establish the extent of that obligation for every circumstance of the future. We can, however, define guidelines which will aid in the resolution of such an issue as the instant one." As the risk was unforeseeable/unconscionable to the Plaintiffs, the subsequent mental/emotional distress was substantial.

211. While this may not have been the Defendant's intent, logically it can be concluded that relief is due in the form of compensation and a simple apology, not only to Plaintiffs but to all Twitter users for the actions of the company with regards to suspension, shadowbanning and limiting of accounts

EIGHTH CAUSE OF ACTION

Tortious Interference

(Declarative and Injunctive Relief)

212. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though set forth fully herein.

213. Defendant's suspensions of the Accounts of Plaintiffs and Others have caused, whether negligent or intentional, the loss of business/transactions between users, including recurring donors/sponsors of Plaintiffs and Others whose business was dependent upon the presence of the Accounts. Furthermore, the suspensions/Shadowbans by Twitter, along with the semi-regular changes to Twitter's Terms of Service, without vis-a-vis bargaining and/or proper notification of users, deliberately and tortiously induce the Breach of Contract claim(s) listed above, and this claim re-emphasizes the Third and Fourth Causes of Action.

NINTH CAUSE OF ACTION

Promissory Estoppel

(Declarative and Injunctive Relief)

214. Plaintiff re-alleges and incorporates by reference each and every preceding paragraph as though set forth in full herein.

215. As the First Cause of Action is the protection and defense of the First Amendment, Promissory Estoppel properly invokes the Fourteenth Amendment in assessing "state action" with regards to 501 U.S. 663, Cohen v. Cowles Media Company (No. 90-634) (1991): "Promissory Estoppel is a law of general applicability".

1    Nor is Promissory Estoppel being invoked by the Plaintiff as a means of
2    avoiding the strict requirements of a libel or defamation claim. Rather, as
3    Twitter is a publishing platform and media company, Cohen v. Cowles holds
4    specific significance in this situation.

5    216. Defendant represented to Plaintiff, and the public at large, that it
6    would enforce its Terms of Service with impartiality as to any social, political,
7    or religious viewpoint. Defendant has repeatedly
8    assured its customers that their accounts would not be banned on the basis of a
9    political disagreement between Defendant's management and its users.

10    217. In reliance on Defendant's repeated promises that it would remain
11    politically neutral, Plaintiff invested significant time, energy, and money into
12    growing his profile and campaign on Defendant's platform.

13    218. Plaintiff's reliance on Defendant's promises and assurances was
14    reasonable and foreseeable. Defendant routinely holds itself out as a platform
15    for its users to create and grow their business by connecting with other users
16    who have similar viewpoints, interests, or hobbies. In order to
17    use Defendant's service, users must agree to the Twitter Rules that sets out
18    rules regarding what actions could cause Defendant to ban an account.
19    Defendant knew that its users would rely on the rules set forth in its terms of
20    service.

21    219. Defendant's decision to suspend/limit/shadowban/deverify all of
22    Plaintiff's accounts has significantly damaged Plaintiff's campaign and
23    business by causing each respectively to lose supporters, income, votes, word
24    of mouth, and all of the work put into to building up Plaintiff's presence on
25    Twitter.

26    220. Therefore, via evidence presented previously, the Defendant must
27    be held liable for violating the agreement via inconsistent enforcement, and
28    prohibited from future biased/inconsistent enforcement of its Terms of Service.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for a judgment as follows:

1. For an injunction which upholds the findings of Knight First Amendment Center vs. Trump, in which the Court found that users cannot be denied their Constitutional Right of First Amendment access to the public forums of President Trump's tweets, and immediately extends restores (that) full access to all currently suspended, limited, and/or shadowbanned, filtered, deverified, unverified, etc. users of Twitter, requiring Defendant to comply.

2. For a declaration that any/every denial of access by Defendant to Twitter's public forums constitutes unconstitutional viewpoint discrimination,

3. For a declaration that Defendant has engaged in unconstitutional viewpoint discrimination against an estimated 50 million people/150 million accounts,

4. For an injunction ordering that Defendant immediately and permanently lift all of its permanent/temporary ban(s) and Shadowbans, and cease and desist from any further temporary or permanent limit, suspension, ban, Shadowban etc. on the Twitter accounts of Plaintiffs and Others (To include but not limited to @CraigRBrittain, @AuditTheMedia, @SenatorBrittain, @Brittain4Senate, @AngMartinelli, et al.).

5. For an injunction to immediately and permanently lift any similar permanent and/or temporary limit, suspension, ban, shadowban, etc. on any other accounts on the platform, where it is estimated that Defendant has permanently suspended over 5 million users/15 million accounts and temporarily limited and/or suspended upwards of over 50 million users/150 million accounts.

6. For an injunction permanently prohibiting Defendant from attempting to enforce the language in its Terms of Service purporting to allow Twitter suspend or ban any account "at any time for any or no reason" and "without liability to you";

7. For an injunction permanently prohibiting Defendant from limiting or suspending access to any of the public forums on its platform, including unverifying, shadowbanning, suspending, blocking or otherwise interfering with the access of any user.

8. For an injunction immediately ordering that Defendant treat all candidates for public office equally under the guidelines of 47 U.S. Code § 315.

9. For an injunction immediately prohibiting Defendant from possessing monopoly power under 15 U.S. Code § 2, ordering Defendant to reorganize and recognizing that Defendant has violated 15 U.S. Code § 2.

10. For an injunction permanently prohibiting Defendant from participating in Tortious Interference, including Shadowbanning, limiting, deverifying/unverifying or suspending users without bargaining or notice, and prohibiting Defendant from altering the Terms of Service without directly bargaining with the users who are subject to the Contract.

11. For an injunction permanently prohibiting Defendant from violating Promissory Estoppel doctrine.

12. For a declaration that Defendant acts as a monopoly/trust in violation of 15 U.S. Code § 2.

13. For a declaration that Defendant has interfered with the 2018 Federal Elections and violated  47 U.S. Code § 315.

14. For a declaration that Defendant has violated 47 U.S. Code § 230 by acting as an information content provider while listing itself as an interactive computer service.

15.  For a declaration that Defendant has violated and continues to violate Plaintiffs and Others' free speech rights under the First Amendment of the US Constitution.

16. For a declaration that Defendant has participated in Tortious Interference and 'Shadowbanned' users.

17. For a declaration that Defendant has violated Promissory Estoppel doctrine and deceived users via their Terms of Service.

18. For compensatory, special, and statutory damages in an amount to be proven at trial, including statutory damages.

19. For prejudgment and post-judgment interest;

20. For costs of suit incurred herein,

21. For reasonable attorney's fees (if applicable), and

22. For such other and further relief as this Court deems just and proper,

23. For an injunction in the form of an additional summary judgment for the Plaintiff, against the Defendant, in accordance with Defendant's valuation of over $25 Billion US Dollars, of no less than $1,000,000,000.00 US Dollars.

24. For an injunction ordering a public apology from the Defendant to all users of their public forums for actions detailed in this suit.

Respectfully submitted,

Craig R. Brittain and Brittain for US Senate "Plaintiffs".

Plaintiff(s) hereby affirm under penalty of Perjury that the entirety of this suit and its allegations are true to the best of their knowledge, were written in Good Faith with the proper purpose of the interest in the preservation of all speech in public forums, to modify and create law within this scope, with a strong basis of evidentiary support and even more to be established during investigation/discovery/testimony/jury trial/witness examination/etc., that any denials of the factual contentions presented are warranted on the evidence, or if specifically so identified, are reasonably based on a belief or lack of information, and in order to protect speech, especially the speech with which we disagree, as well as all of the rights of all people, both natural and Constitutional, and sign(s) to affirm with regards to Rule 11 of TITLE III of the Federal Rules of Civil Procedure.

DATED: June 5, 2018

Craig R. Brittain

8625 E. Sharon Dr.

Scottsdale, AZ, 85260

(602) 502-5612

craig@brittainforsenate.com

craigrbrittain@gmail.com